**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| IQOR HOLDINGS INC., *et al.*,[1] | ) Case No. 20-34500 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DECLARATION OF DAVID A. KAMINSKY,**
**CHIEF FINANCIAL OFFICER OF IQOR HOLDINGS INC.,**
**IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, David A. Kaminsky, hereby declare under penalty of perjury:[2]

1.     I am the Chief Financial Officer of iQor Holdings Inc. and certain of its affiliated debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company" or "iQor").  I have served as the Chief Financial Officer of iQor since joining the Company in 2015.

2.     I have 22 years of experience serving as a chief financial officer.  I received a bachelor's degree in accounting from the University of Bridgeport.  My professional experience involves serving as a senior executive in finance, IT management, and administrative operations. As Chief Financial Officer for iQor, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

3.     Each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/iqor.  The location of the Debtors' service address is:  200 Central Avenue, 7th Floor, St. Petersburg, Florida 33701.

[2]   Capitalized terms used but not defined immediately herein shall have meaning ascribed to such terms in this declaration or in the Plan, as applicable.

States Bankruptcy Court for the Southern District of Texas (the "Court") on September 10, 2020. To minimize the adverse effects on their businesses, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  The facts set forth in each First Day Motion are incorporated herein by reference.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

4.      Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge, information obtained from the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge.  I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

<div align="center">**Introduction**</div>

5.      The Debtors commence these chapter 11 cases to implement a restructuring through a prepackaged chapter 11 plan of reorganization (the "Plan"), a copy of which has been filed contemporaneously herewith.  The restructuring transactions contemplated by the Plan will deleverage the Debtors balance sheet by nearly $513 million and provide additional liquidity to allow iQor to continue to provide its customers with connected and insightful solutions in the business process outsourcing ("BPO") and product support industries.

6.      The Plan has the support of holders of approximately 100 percent in principal amount of the Priority Term Loan Claims, holders of approximately 85 percent in principal amount of the First Lien Term Loan Claims, and holders of approximately 50 percent in principal amount

of the Second Lien Term Loan Claims, who have documented their support for the restructuring and these chapter 11 cases through a restructuring support agreement dated as of July 23, 2020 (as amended by the First Amendment to Restructuring Support Agreement dated as of July 29, 2020, the Second Amendment to Restructuring Support Agreement dated as of August 14, 2020, and the Third Amendment to the Restructuring Support Agreement dated as of August 31, 2020, the "RSA") attached hereto as **Exhibit A**.  Importantly, the Plan does *not* impair any creditors, other than the parties that have overwhelmingly voted in favor of the Plan and the current equity holders.  As a result, general unsecured claims will ride through the bankruptcy and will be paid in the ordinary course of business or on the effective date of the Plan.  All contracts and leases will be assumed and will ride through the bankruptcy.  The Debtors will also provide all releasing parties under the Plan the opportunity to opt out of the releases contained in the Plan by checking the opt-out box on their opt-out form.   Further, the Debtors have secured debtor-in-possession financing facilities, which will address the Debtors' immediate liquidity needs by providing $130 million in aggregate financing, a portion of which will be used to refinance existing debt, and provide for the consensual use of cash collateral.

### Background

7.     The Company is a recognized global provider of technology-enabled BPO solutions, serving some of the world's largest, well-known brands.  iQor provides a range of intelligent customer support and outsourcing services through its two primary business segments—the customer care/call center business and the product support business.  Through its operations, iQor partners with its customers to deliver comprehensive technology-enabled solutions for servicing the entire customer lifecycle.  Specifically, the Company's call center business provides customers with multiple service offerings, including technical support solutions, analytical enabled customer retention solutions, and revenue generation support services.  The

Company's product support business provides customers with technical services and supply chain solutions, including repair services, quality assurance, kitting and packing, asset recovery and recycling services, supply chain management, and service part logistics.

8.      Through a combination of organic growth and growth-by-acquisition strategies, the Company enjoys a significant market share in specific industries, as reflected by its strong relationships spanning many years, with industry-leading Fortune 500 companies.  The Company has established long-term relationships with many of its customers and has been successful in expanding these relationships to incorporate additional service offerings across the customer lifecycle.  As of December 31, 2019, approximately 69 percent of revenue from the Company's 50 largest customers is derived from the use of multiple technology-enabled solutions across the Company's integrated BPO platform.

9.      iQor's customers include, among others, original equipment manufacturers ("OEMs") for technology hardware, retailers (including ecommerce), financial institutions, healthcare providers, telecommunication carriers, and insurance providers.  iQor has consistently strived to stay competitive with its peers by developing new business initiatives and technical solutions to drive operational efficiency.  Despite iQor's success in the call center and product support industries, and its competitive market share, market headwinds and industry-wide changes—particularly in the product support industry—have directly and negatively affected iQor's earnings and liquidity.  Technological improvements in the engineering of electronic componentry  has also had a significant impact on the Company—as a result of the dramatic improvement in the quality of technology devices, devices fail less frequently, resulting in decreased demand for remanufacturing and repairing of devices.   Moreover, customer concentration in the product support business has exposed the business to added risk.  With core

product support customers accounting for a significant percentage of the segment's revenue and EBITDA, reductions in product volume commitments from the Company's largest customers due to an alternative delivery model and the competitive landscape have materially reduced its profitability and cash generating capabilities. Specifically, the Company has a significant concentration of exposure to the set top box market supporting a particular customer that accounted for approximately 19 percent of the total Company's revenue and 83 percent of the product business revenue in 2019. Since January 2019, the Company has experienced a nearly 94 percent decline in forecasted annual production volumes from this particular customer largely due to the demise of the satellite television market.

10.     In addition to industry challenges, the Debtors have contended with an overleveraged capital structure, which has imposed onerous debt service expense on the enterprise. As of August 30, 2020, the Debtors' funded debt totals approximately $865 million, and approximately $823 million, or approximately 95 percent, of the Debtors' total outstanding funded debt obligations are set to mature within the next two years.

11.     As a result of the foregoing, iQor recognized the impact that these industry challenges could have on future earnings absent implementing a strategic path forward. The Company has been proactive in implementing a range of operational restructuring initiatives to maintain its market position and improve performance in the BPO market. While these restructuring initiatives enabled the Company to focus on growing its integrated North American BPO platform, the Company faced near-term debt service obligations and recognized the need for a long-term solution. In the first quarter of 2020, the Debtors engaged a team of outside advisors to explore strategic alternatives, including a comprehensive restructuring, retaining Evercore Group L.L.C. ("Evercore") as investment banker and financial advisor in January 2020; FTI

Consulting, Inc. as restructuring advisor in February 2020; and Kirkland & Ellis LLP ("<u>Kirkland</u>") in March 2020, in Kirkland's capacity as restructuring counsel.  Beginning in March 2020, the Debtors entered into comprehensive restructuring discussions with an ad hoc group of lenders under iQor's First Lien Term Loan Facility and Second Lien Term Loan Facility (each as defined below) (the "<u>Ad Hoc Group</u>") to consummate a potential transaction to delever the Company's capital structure.  The Ad Hoc Group engaged Gibson, Dunn & Crutcher LLP, as legal advisor, and Greenhill & Co., LLC, as investment banker, to facilitate due diligence and restructuring negotiations.

12.     Shortly after these discussions began, the Company's global operations were precipitously impacted by the worldwide spread of COVID-19 and the resultant shuttering of the global economy.  Following the World Health Organization's declaration of COVID-19 as a global pandemic, national, state, and local governments in the United States and throughout the world imposed curfews, social distancing protocols, and shelter-in-place orders that severely impacted the regions in which the Debtors operate.[3]  These unprecedented events affected the Company's ordinary course operations by forcing the closure of many of its operating centers, thereby requiring a rapid transition to work from home solutions in the United States, Philippines, India, Hong Kong, Trinidad, and Panama for customers that would allow such conversion. This exacerbated the Debtors' strained liquidity condition and accelerated the need to implement a strategic transaction.  As a result of the foregoing, it became apparent that the Debtors would require incremental financing to provide the Debtors with near-term liquidity to forestall an

---

[3]     Jamie Ducharme, *World Health Organization Declares COVID-19 a 'Pandemic.' Here's What That Means*, TIME (Mar. 11, 2020), https://time.com/5791661/who-coronavirus-pandemic-declaration/.

imminent bankruptcy filing, thereby providing the Debtors and the Ad Hoc Group time to continue exploring potential restructuring opportunities.

13.     On May 29, 2020, following extensive, good faith negotiations, certain members of the Ad Hoc Group agreed to provide iQor US, Inc. ("iQor US") with $35 million super-priority "bridge financing" facility (the "Priority Term Loan Facility").  With the time provided by the incremental liquidity under the Priority Term Loan Facility, the Debtors were able to negotiate the framework for a consensual restructuring with their major creditor constituents, the terms of which are reflected in the RSA and the chapter 11 plan term sheet attached as Exhibit B to the RSA (the "Restructuring Term Sheet").  The RSA and Restructuring Term Sheet contemplate a swift restructuring that is supported by the Sponsors (as defined below) and holders of (a) 100 percent of the outstanding principal amount under the Priority Term Loan Facility, (b) approximately 85 percent of the outstanding principal amount under the First Lien Term Loan Facility, and (c) approximately 50 percent of the outstanding principal amount of the Second Lien Term Loan Facility.

14.     As a result of these efforts, the Debtors have commenced these chapter 11 cases with a Plan that enjoys overwhelming stakeholder support.  I understand that the Plan has been accepted by 100 percent of creditors that submitted a vote to accept or reject the Plan.  I understand that no creditor has voted to reject the Plan, and approximately 97 percent of the lenders under the First Lien Term Loan Facility and 84 percent of the lenders under the Second Lien Term Loan Facility have submitted votes in favor of the Plan.  The Plan will deleverage the Debtors' balance sheet by approximately $513 million and refinance the remainder of the Debtors' funded debt with $155 to $177.5 million in exit financing that will also fund the Debtors' businesses upon emergence from chapter 11.  Notably, the Plan leaves general unsecured creditors unimpaired and

will allow the Debtors to minimize disruptions to their go-forward operations while effectuating a value-maximizing transaction in chapter 11.

15.     Further, the Plan provides the Debtors with $130 million in aggregate debtor-in-possession financing through an $50 million delayed draw term loan facility (the "Term Loan DIP Facility") and an $80 million asset-based revolving credit facility (the "DIP ABL Facility," and together with the Term Loan DIP Facility, collectively, the "DIP Facilities"), which will be provided by certain of the lenders under the Debtors' First Lien Term Loan Facility (the "First Lien Term Loan Lenders") and the lender under the Receivables Facility (the "Receivables Facility Lender"), respectively.   In addition to the much-needed access to incremental liquidity provided by the DIP Facilities, a substantial portion of the Term Loan DIP Facility and the DIP ABL Facility will be used to refinance outstanding obligations under the Priority Term Loan Facility and the Receivables Facility, respectively.[4]  The material terms of the DIP Facilities are set forth in the Debtors' motion seeking approval of debtor-in-possession financing and use of cash collateral (the "DIP Motion") filed contemporaneously herewith.

16.     As described further herein, over the past several years, the Company has experienced a significant decline in volume commitments from the Debtors' product support customers.  The Company has historically implemented restructuring initiatives to proactively respond to these volume declines and customer demand. For fiscal year 2020, the Company currently expects an $112 million drop in revenue from its largest product support customer. As a result of the foregoing, the Company will continue to pursue various restructuring initiatives, which could include, among other things, a consolidation of Company's product support facilities

---

[4]     With respect to any letters of credit outstanding under the Receivables Facility as of the Petition Date, such letters of credit will be deemed to have been issued under the DIP ABL Facility.

and adjustments to the Company's production capacity. To provide the Reorganized Debtors with sufficient liquidity as a going concern (including any potential amounts necessary to fund any restructuring initiatives with respect to the product support business), the Reorganized Debtors will enter into a term loan exit facility (the "Term Loan Exit Facility") and an exit, asset-based loan facility (the "ABL Exit Facility," together with the Term Loan Exit Facility, the "Exit Facilities") upon the Debtors' emergence from chapter 11. The First Lien Term Lenders have committed to provide the Reorganized Debtors with a Term Loan Exit Facility in an aggregate principal amount between $75 million and $97.5 million (depending on the strategic alternatives expected to be implemented by the Reorganized Debtors with respect to the product support business) consistent with the terms set forth in the Restructuring Term Sheet and the Term Loan Exit Facility Term Sheet attached to the Restructuring Term Sheet as Annex B (the "Term Loan Exit Facility Term Sheet"). Furthermore, the anticipated material terms of the proposed $80 million ABL Exit Facility are attached to the Disclosure Statement as Exhibit D (the "ABL Exit Facility Term Sheet, together with the Term Loan Exit Facility Term Sheet, the "Exit Facilities Term Sheets") and remain subject to ongoing negotiation between the Debtors and the Receivables Facility Lender. As set forth in the Exit Facilities Term Sheets, the ABL Exit Facility and the Term Loan DIP Facility will respectively repay outstanding ABL DIP Claims and Term Loan DIP Claims in full on the Effective Date. Altogether, the Plan and RSA, and the transactions contemplated thereunder, will provide meaningful recoveries the Debtors' senior and junior creditors and leave the Debtors poised to continue operations and capitalize on their delevered balance sheet.

17.    With a fully solicited Plan supported by an overwhelming majority of creditors entitled to vote on the Plan, it is imperative that the Debtors proceed swiftly to confirmation of the

Plan and emergence from these chapter 11 cases.  The Debtors believe the transactions embodied in the Plan will leave the reorganized enterprise with a considerably diminished debt load and well-positioned to compete in the BPO and aftermarket product support industries.  Importantly, the Debtors' customer relationships depend on customer confidence in iQor's viability, which may be impacted by publicity surrounding the Company's chapter 11 filing and financial condition.  As such, the Debtors commenced these chapter 11 cases with a clear message to their customers and vendors:  the Company and its future equity owners are implementing a balance sheet restructuring that will allow the Company to emerge seamlessly and expeditiously from chapter 11 with an optimized capital structure and as a strong partner that customers can continue to trust.  A prolonged stay in chapter 11 is unnecessary and would only result in significant incremental administrative costs.  Accordingly, the Debtors have filed a scheduling motion to be heard at the first-day hearing, which requests the following dates, subject to the Court's availability:

| Event | Proposed Date |
|---|---|
| Confirmation and Disclosure Statement Objection Deadline | October 9, 2020 |
| Reply Deadline | October 13, 2020 |
| Combined Confirmation and Disclosure Statement Hearing | October 14, 2020 |

18.     To familiarize the Court with the Debtors, their businesses, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration into five sections as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition corporate and capital structure;

- **Part III** describes the circumstances leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring initiatives;

- **Part IV** describes the RSA and these Chapter 11 Cases; and

10

- **Part V** sets forth the basis for the relief requested in each First Day Motion.

## Discussion

## I.    Overview of the Company.

### A.    Corporate History.

19.    iQor was founded in 1998 as IntelliRisk Management Corporation, a company focused on BPO and accounts receivable management services.  In 2007, IntelliRisk Management Corporation changed its name to iQor and was acquired by an entity controlled by Guggenheim Investment Management, LLC ("Guggenheim") and iQor's then-existing management team. Following Guggenheim's acquisition of iQor, entities controlled by HGGC, LLC ("HGGC") and SIH Capital Partners (Combined), LLC ("SCPC") acquired a majority ownership interest in the Company in 2010 (the "Sponsor Transaction").   Following a series of transactions, entities controlled by TRG Management LP ("TRG" and, together with HGGC and SCPC, the "Sponsors") acquired a minority interest in the Company later in 2010.

20.    Since its inception, iQor has grown to become a leading provider of outsourced customer solutions, expanding its network of service operations globally throughout North America, South America, Asia, and Europe.  With a proven platform for industry consolidation and organic growth, the Company further evolved its business through synergistic acquisitions to maximize value and broaden its capabilities.  The Company's pursuit of growth was achieved, in part, due to the industry-knowledge and financial backing of the Company's Sponsors.  Prior to the Sponsor Transaction, the Company globally operated less than 20 call center facilities and employed less than 10,000 employees with a preponderance of its revenues generated from accounts receivable management-based activities.  Today, the Company provides a broad array of customer support services and operates more than 40 call centers in eight countries.  Prior to the

COVID-19 pandemic, the Company employed more than 40,000 people globally.[5]   The Company's broad geographic footprint enables customers to receive around-the-clock support from the Debtors' highly qualified and trained employees.   The map below reflects the multinational platform of the iQor enterprise, with customer care/call center locations delineated in red and product support services shown in green.



21.   ***Call Center Business Transactions***.   Following the Sponsor Transaction, the Company initiated a wave of strategic and synergistic transactions to strengthen its existing business lines and venture into other platforms.   In 2010, the Company expanded its accounts receivable management business through the acquisition of Receivable Management Services International, Inc. ("RMS").   At the time of the acquisition, RMS was a leader in business-to-business accounts receivable outsourcing services and supplemented iQor's already robust business-to-consumer capabilities.

---

5   As a result of the global COVID-19 pandemic and the related government-mandated "shelter-in-place" orders, the Company reduced its global workforce and instituted a furlough program that affected employees across the globe.  The Company expects to restore its workforce once the public health crisis subsides.

22.     Between 2011 and 2016, the Company acquired a number of companies across its customer solutions platform.  With a changing technological and digital landscape, the Company expanded its analytics and self-service reporting capabilities in 2012 by acquiring HardMetrics Inc. ("HardMetrics").  The acquisition of HardMetrics provided the Company with revolutionary, cloud-based visual intelligence, which enabled on-demand interactive reporting for targeted customer interaction campaigns and faster recognition of, and response to, emerging trends.

23.     On the heels of the HardMetrics acquisition, the Company further enhanced its technology-enabled BPO solutions through the acquisition of CCT Group in 2012. The Company's acquisition of CCT Group enabled the Company to broaden its customer care capabilities and revenue generation offerings and apply innovative analytics and business intelligence tools to enhance the customer experience.  Furthermore, the CCT Group acquisition expanded the Company's global footprint by gaining several call center facilities in Panama and the Philippines.   In 2016, the Company acquired a portion of Asurion's customer support operations, including facilities in Pennsylvania, Florida, Oregon, and Mississippi.  The Asurion acquisition accelerated the Debtors' growth as an integrated customer solutions service provider and expanded the Debtors' technical support capabilities.

24.     ***Product Support Business Transactions***.  Amid the growth of its call center business, the Company expanded its operations by entering into the product servicing market through various strategic transactions, ranging from brand partnerships to business acquisitions. In 2014, iQor acquired the aftermarket services business of Jabil Circuit, Inc. ("Jabil" and, the transaction, the "Jabil Transaction").  As a result of the Jabil Transaction, the Company became the exclusive aftermarket service provider for Jabil and grew substantially through the acquisition, with operations in 17 countries and the addition of more than 13,000 aftermarket services

employees.  Following the Jabil Transaction, the Company continued to reinforce its product support business through various brand partnerships, including, among others, a partnership with Microsoft to provide repair, testing, refurbishing, and fulfillment in North America for all Microsoft hardware devices, such as Xbox, mobile phones, and Surface tablets.

25.    ***Global Expansion***.  Recognizing the operational and financial benefits of being a global enterprise, the Company began to sizably expand its global operations in India and the Philippines.  In 2015, the Company began to build an expanded, pan-India service network by establishing call center and product support service facilities throughout the country. The Company's expansion in India created thousands of new jobs throughout India's 29 states (although the product support operations failed to reach a profitable state and the corresponding contracts were discontinued).  Between 2016 and 2019, the Company also significantly expanded its operations in the Philippines by opening several call center facilities and hiring thousands of employees.  Over the next several years, the Company continued to expand its presence throughout the United States and abroad and today, the Company operates more than 60 facilities located throughout the United States, Canada, India, Trinidad and Tobago, Poland, China, Mexico, the Philippines, and Panama (primarily supporting the call center business).  The call center business has also grown organically through productivity improvements and leveraging fixed costs.

26.    As discussed in greater detail in the Debtors' Cash Management Motion, the Debtors and their foreign non-Debtor affiliates engage in regular, ordinary course intercompany transactions to streamline the Company's funding of operating expenses incurred by the Debtors' foreign non-Debtor affiliates and to centralize cash flows across the Company's global enterprise. In connection with the Company's global operations, certain Debtors and foreign non-Debtor affiliates provide specified intercompany services to each other through various intercompany and

transfer pricing agreements (collectively, the "Intercompany Agreements"). The corporate services provided under the Intercompany Agreements include, among other things, call center resources, financial services, sales and marketing services, logistics support, corporate and strategic management services, IT services, and treasury and risk management services in exchange for a fixed fee and payment of direct and indirect costs incurred.

27. In addition to the intercompany transactions arising under the Intercompany Agreements, certain of the Debtors' foreign non-Debtor affiliates rely on the transfer of funds from Debtor iQor US to fund their ordinary course operating expenses, including payroll and vendor obligations incurred for the benefit of the Debtors. Accordingly, to facilitate the Company's global funding needs, iQor US routinely transfers funds to certain of its foreign non-Debtor affiliates in the Philippines, India, Poland, Mexico, Trinidad, Panama, and Hong Kong. Absent these intercompany transactions, these foreign non-Debtor affiliates would be unable to satisfy their ordinary course operating expenses as the intercompany transactions account for these entities' sole source of revenue and operating cash.

**B.    Business Operations.**

28. The Company's business centers around a delivery model of end-to-end customer engagement solutions and technology-enabled BPO solutions. iQor's innovative and award-winning technology, logistics, and analytics platforms enable it to measure, monitor, and analyze brand interactions, improve business processes, and find operational efficiencies that lead to superior outcomes for its partners across customer and product life cycles. Through these efforts, the Company delivers solutions on a variety of platforms to several of the top providers in the media and mobility, financial services, retail and e-commerce, and energy industries, among others.

29.     ***Call Center and Customer Services***.  The Company's call center business provides its customers with proprietary technology and analytics, and tailored customer engagement. The Company's call center business generates approximately 83 percent of the Company's revenue for the six months ended June 30, 2020.  The Company leverages its global footprint to optimize service locations and channels, with over 40 call center facilities in eight countries. As of December 31, 2019, the Company's call center business had approximately 41,000 employees, 71 percent of which operate out of the Philippines.   For the year ended December 31, 2019, the Company's call center operations in the Philippines support approximately 47 percent of the Company's call center business revenue.  While servicing major companies across various industries, the Debtors' strongest customer relationships within the call center business derive from the telecom, retail, and financial services industries.

30.     The Company's call center business uses a consultative approach and intelligent technology systems to help drive agent behaviors and enhance productivity.  Specifically, iQor's call center business encompasses numerous differentiated proprietary digital platforms with over 40 separate customer experience solutions, and includes a team of approximately 25 data scientists that lead the Debtors' proprietary data collection platforms.  For example, the Debtors' proprietary intelligent call monitoring system allows iQor and its clients to fully monitor all interactions, and automatically detect and assist call center agents in improving their skills or staying within compliance targets.  While automation and artificial intelligence pose threats to the call center industry, iQor has maintained high customer satisfaction due to its ability to mesh live agents with proprietary technologies.  These technologies reduce human error and enhance agent productivity.

31.     The Company's call center business offerings also include engineering and data science initiatives, which are delivered through the Company's revolutionary cloud-based

analytics technology, interaction analytics (including advance speech analytics), and applied analytics.  These unique, proprietary offerings enable customers to manage their businesses in real-time, respond to evolving challenges, and identify new opportunities.  Such service offerings are augmented by iQor's proprietary security technology, which provides iQor's clients with peace of mind that the Company's call center facilities are adequately protected.

32.     By implementing productivity improvements and leveraging fixed and operating costs, as well as an efficient capital expenditure investment model, the call center business has achieved consistent revenue and adjusted EBITDA growth over the past several years, as reflected in the below charts.[6]



---

6     The figures set forth in the below charts reflect revenue and adjusted EBITDA from continuing operations.

17

33. ***Product Support Services***. The Company's product support business provides aftermarket product logistics and repair servicing, which, for the six months ended June 30, 2020, accounted for approximately 17 percent of the Company's revenue. The Company's product support operations are located in the United States and Mexico. The Company's operations in Mexico represent approximately 60 percent of the Company's annual product support business revenue. The Company's product support business offers a wide range of solutions, including, among others, asset recovery and recycling services, network optimization, supply chain management, and product servicing, testing, repairs, and refurbishment.

34. The Company offers over 1.2 million square feet of repair and warehouse space in Tennessee, Texas, and Mexico. Product support employees are expertly trained in the identification and qualification of parts and service suppliers, which enables the Company to optimize cost and flexibility. Through its repair and refurbishing services, the Company gathers data that efficiently identifies and resolves errors, improving the overall lifespan of the product and reducing customer costs. The Company's refurbishment processes ensure high-quality functional, cosmetic, and configuration standards for customer products. Further, with the understanding that enduring a return merchandise authorization process is frustrating for the customer and costly for a company, the Company has developed integrated, customer-centric services that use analytics to connect technical support with parts data to decipher and remedy problems quickly and efficiently.

## II.    The Debtors' Prepetition Corporate and Capital Structure.

35. The chart below depicts the Company's current corporate structure, which is also attached hereto as **Exhibit B**.



36.     Each Debtor is a direct or indirect wholly-owned subsidiary of iQor Holdings Inc. ("iQor Holdings").   The Debtors' foreign subsidiaries have not commenced bankruptcy proceedings.   As of the August 30, 2020, the Debtors have approximately $864.7 million of consolidated funded debt obligations as well as approximately $17.7 million of outstanding capital lease obligations, promissory notes, purchase notes, and preferred equity with a stated aggregate liquidation preference of approximately $336.5 million.   The following table depicts the Debtors' prepetition capital structure, exclusive of accrued but unpaid interest and fees:

| FUNDED DEBT | | |
|---|---|---|
| **Funded Debt** | **Maturity** | **Outstanding Principal Amount as of August 30, 2020** |
| Priority Term Loan Facility | September 2020 | $26,594,478 |
| Receivables Facility | March 2023 | $41,621,815[7] |
| First Lien Term Loan Facility | April 2021 | $626,525,088 |
| Second Lien Term Loan Facility | April 2022 | $170,000,000 |
| | **Total Funded Debt** | $864,741,381 |
| **OTHER SECURED DEBT** | | |
| **Other Secured Debt** | **Maturity** | **Outstanding Principal Amount as of August 30, 2020** |
| Capital lease, promissory note, and purchase note Debtor obligations | Various | $17,707,265 |
| **PREFERRED EQUITY** | | |
| **Preferred Equity** | **Shares Outstanding** | **Approximate Liquidation Preference** |
| Series SS Senior Preferred Stock | 55,000 | $55,000,000 |
| Series A Preferred Stock | 6,931,295 | $281,500,000 |

A.      **The Priority Term Loan Facility.**

37.      iQor Holdings, as holdings, iQor US Inc. ("iQor US"), as borrower, the several lenders party thereto, and Wilmington Savings Fund Society, FSB ("WSFS"), as successor administrative agent and collateral agent, are each party to that certain Super-Priority Term Loan Credit Agreement, dated as of May 29, 2020 (as the same may be amended, amended and restated, or otherwise modified from time to time, the "Priority Term Loan Credit Agreement").   The Priority Term Loan Facility is guaranteed by each of the Debtors (with the exception of iQor Seller Services, LLC, Interactive Response Technologies, LLC, Cyber Teleservices Marketing, Inc., iQor Receivables SPE LLC, and iQor Receivables SPE 2, LLC) and is secured by first priority liens (subject to certain permitted liens) on all of the collateral under the First Lien Credit

---

[7]      Exclusive of approximately $5 million of outstanding letters of credit.

Agreement (as defined below), which encompasses substantially all assets of such Debtors other than the assets securing the Receivables Facility (as defined below), as well as first priority liens (subject to certain permitted liens) on the equity interests of certain foreign non-Debtor subsidiaries.

38.     The Priority Term Loan Credit Agreement provides for $35 million in term loan commitments to iQor US Inc. Following entry into the Priority Term Loan Facility, iQor Holdings, iQor US, the several lenders party thereto, and WSFS entered into the (a) First Amendment to Super-Priority Term Loan Credit Agreement dated July 30, 2020 to extend the maturity date of the Priority Term Loan Facility from July 30, 2020 to August 14, 2020, (b) Second Amendment to Super-Priority Term Loan Credit Agreement dated August 14, 2020 to extend the maturity date of the Priority Term Loan Facility from August 14, 2020 to August 30, 2020, and (c) Third Amendment to Super-Priority Term Loan Credit Agreement dated September 2, 2020 to extend the maturity date of the Priority Term Loan Facility from August 30, 2020 to September 9, 2020. As of the date hereof, approximately $26.6 million in aggregate principal amount remains outstanding under the Priority Term Loan Facility.

### B.     The Receivables Facility.

39.     iQor Receivables SPE LLC ("iQor SPE"), as borrower, and Wells Fargo Bank, National Association ("Wells Fargo"), as lender, are each party to that certain Credit Agreement, dated as of March 9, 2020 (as the same may be amended, amended and restated, or otherwise modified from time to time, the "Receivables Facility Agreement," and the facility thereunder, the "Receivables Facility"). The Receivables Facility is supported by a borrowing base that is calculated on a monthly basis for certain billed and unbilled designated receivables. Accordingly, iQor SPE's availability under the Receivables Facility is limited by the borrowing base percentages for billed and unbilled designated receivables and required reserves. The borrowing base under

the Receivables Facility is calculated as the result of:  (a) 85 percent multiplied by the amount of Eligible Billed Accounts (as defined in the Receivables Facility Agreement); plus (b) the lesser of: (i) 75 percent multiplied by the amount of Eligible Unbilled Accounts (as defined in the Receivables Facility Agreement) and (ii) $20 million; minus (c) Reserves (as defined in the Receivables Facility Agreement).

40.     Pursuant to documentation in connection with the Receivables Facility Agreement, certain of the Debtors sell or contribute, directly and indirectly, certain of their accounts receivable to iQor SPE.   iQor SPE is a wholly-owned subsidiary of iQor Receivables SPE 2, LLC ("iQor SPE 2, and together with iQor SPE, the "iQor SPE Entities").  The iQor SPE Entities were created as bankruptcy-remote special purpose entities to permit iQor SPE's entry into the Receivables Facility Agreement.  In connection with iQor SPE's entry into the Receivables Facility Agreement, the Debtors obtained a lien release on certain prospective contributed and sold receivables designated under the Receivables Facility Agreement.  As such, Wells Fargo holds a first priority lien (subject to certain permitted liens) on the designated contributed and sold receivables under the Receivables Facility Agreement.

41.     The Receivables Facility Agreement allows iQor SPE to access up to $80 million in revolving credit commitments.  As of the Petition Date, approximately $41.6 million in principal amount remains outstanding under the Receivables Facility and approximately $5 million is outstanding in letters of credit.  The Receivables Facility matures on the earlier of (x) March 9, 2023 and (y) the date that is 91 days prior to the occurrence of the "Maturity Date" (or other similar or replacement term) under any other indebtedness in excess of $35 million of any Transaction Party (as defined in the Receivables Facility Agreement).

42.     Importantly, the proceeds of the designated accounts receivable serve as a material source of day-to-day operating liquidity for the Debtors.  Absent being refinanced by the DIP ABL Facility, I understand that the Receivables Facility would be in default as a result of the Debtors' chapter 11 filing, shutting off the Debtors' access to cash from the collection of their designated accounts receivable.  I understand that the Receivables Facility Lender would, upon an event of default under the Receivables Facility, be allowed to assert control over all designated receivable collections, and allocate such funds to satisfy outstanding and subsequently accrued obligations under the Receivables Facility, thereby limiting the Debtors' access to cash from the collection of such accounts receivable.  This would materially impact the Debtors' liquidity.

43.     As illustrated in the DIP Motion, filed contemporaneously herewith, the Receivables Facility Lender has agreed to provide postpetition financing in an aggregate amount of up to $80 million.  To bring the accounts receivable collateral under the Receivables Facility into the Debtors' estate, thereby permitting the Debtors access to the liquidity generated by such collateral, the Debtors intend to file the iQor SPE Entities for chapter 11.  Pursuant to the DIP Motion, the Debtors are seeking authority to, among other things, enter into the DIP ABL Facility and use proceeds thereof to refinance the existing Receivables Facility.  I understand that, subject to the Court's approval, the Debtors will refinance and terminate the Receivables Facility and related documentation.  In connection therewith, and to permit the chapter 11 filing of the iQor SPE Entities, I understand that the iQor SPE Entities will effectuate consensual amendments to their respective limited liability company agreements, and each independent director that manages each of the iQor SPE Entities will consensually resign.  I understand that this process will enable the Debtors to avoid a substantial liquidity shortfall by obtaining access to much-needed cash from

the collection of designated accounts receivable under the Receivables Facility, which would otherwise be unavailable to the Debtors.

### C.   The First Lien Term Loan Facility.

44.    iQor Holdings, as holdings, iQor US, as borrower, the lenders party thereto, and WSFS, as administrative agent and collateral agent, are each party to that certain First Lien Credit Agreement, dated as of April 1, 2014 (as amended by that certain Amendment No. 1, dated as of May 11, 2018, Amendment No. 2, dated as of November 2, 2018, and Omnibus Amendment and Consent, dated as of May 29, 2020, and as further amended, amended and restated, or otherwise modified from time to time, the "First Lien Term Loan Credit Agreement" and, the facility thereunder, the "First Lien Term Loan Facility").  The First Lien Term Loan Facility is guaranteed by each of the Debtors (with the exception of iQor Seller Services, LLC, Interactive Response Technologies, LLC, Cyber City Teleservices Marketing, Inc., iQor Receivables SPE LLC, and iQor Receivables SPE 2, LLC) and is secured by a first priority lien (subject to certain permitted liens) on substantially all assets of such Debtors other than the assets securing the Receivables Facility.

45.    Upon iQor US's entry into the First Lien Term Loan Credit Agreement, the closing date term loans (the "Term B Loans") were issued in the aggregate principal amount of $610 million, amortizing at 0.25 percent quarterly.  Pursuant to the First Lien Credit Agreement, interest on the Term B Loans accrues at the Eurocurrency Rate (as defined in the First Lien Credit Agreement) *plus* 5.00 percent.  Additionally, pursuant to that certain Amendment No. 2 dated as of November 2, 2018, certain members of the Ad Hoc Group (the "Incremental Term Loan Lenders") agreed to extend incremental credit (the "Incremental Term Loan") to iQor US in the aggregate principal amount of $40 million.  The Incremental Term Loan accrues interest at LIBOR *plus* 5.50 percent.  The First Lien Term Loan Facility (including the Incremental Term Loan)

matures on April 1, 2021.  As of the Petition Date, approximately $626.5 million in aggregate principal amount remains outstanding under the First Lien Term Loan Facility.

> **D.      The Second Lien Term Loan Facility.**

46.      iQor Holdings, as holdings, iQor US, as borrower, the lenders party thereto, and Alter Domus, as successor administrative agent and collateral agent, are each party to that certain Second Lien Credit Agreement, dated as of April 1, 2014 (as amended by that certain Amendment No. 1, dated as of May 11, 2018 and Omnibus Amendment and Consent, dated as of May 29, 2020, and as further amended, amended and restated, or otherwise modified from time to time, the "Second Lien Term Loan Credit Agreement" and, the facility thereunder, the "Second Lien Term Loan Facility").  The Second Lien Term Loan Facility is guaranteed by each of the Debtors (with the exception of iQor Seller Services, LLC, Interactive Response Technologies, LLC, Cyber City Teleservices Marketing, Inc., iQor Receivables SPE LLC, and iQor Receivables SPE 2, LLC) and is secured by a second priority lien (subject to certain permitted liens) on substantially all assets of such Debtors other than the assets securing the Receivables Facility.  Upon entry into the Second Lien Term Loan Credit Agreement, the Second Lien Term Loan Facility was issued in the aggregate principal amount of $170 million, which does not amortize. The Second Lien Term Loan Facility accrues interest at LIBOR *plus* 8.750 percent, and matures on April 1, 2022. As of the Petition Date, approximately $170 million in aggregate principal amount remains outstanding under the Second Lien Term Loan Facility.

> **E.      Preferred Stock.**

47.      iQor Holdings' Third Amended and Restated Certificate of Incorporation (as amended, supplemented, or otherwise modified from time to time, the "Certificate of Incorporation") authorizes its Board of Directors (the "Board") to establish one or more series of

preferred stock.  Pursuant to the Certificate of Incorporation, iQor is authorized to issue up to 10,000,000 shares of Preferred Stock, par value $0.001 per share.

1.      Series SS Senior Preferred Stock.

48.      In connection with the Jabil Transaction, iQor issued 50,000 shares of Series S Senior Nonconvertible Cumulative Preferred Stock (the "Series S Preferred Stock") to Jabil, pursuant to a private placement.  In August 2019, Jabil exchanged the Series S Preferred Stock for 55,000 shares of Series SS Senior Non-Convertible Cumulative Preferred Stock (the "Series SS Senior Preferred Stock").  The Series SS Preferred Stock has a par value of $0.001 per share with a liquidation value of (a) $1,000 per share through December 31, 2023, (b) $1,181.82 per share from January 1, 2024 through December 31, 2024, and (c) $1,363.64 per share on or after January 1, 2025.  The Series SS Senior Preferred Stock does not accrue dividends and is subject to a mandatory redemption by iQor Holdings upon the earlier of (x) April 1, 2025 and (y) a liquidation event (including, but not limited to, iQor Holdings' voluntary or involuntary bankruptcy filing).

49.      The Series SS Preferred Stock is structurally senior to the Series A Preferred Stock (as defined below), and prohibits iQor Holdings' issuance of senior preferred stock.  Holders of the Series SS Senior Preferred Stock do not have a consent right over the Debtors' incurrence of any future indebtedness or any chapter 11 filing.  As of the Petition Date, 55,000 shares of Series SS Preferred Stock remains outstanding with an aggregate liquidation preference of approximately $55 million.

2.      Series A Preferred Stock.

50.      On March 1, 2012, iQor Holdings filed a Certificate of Designations, Powers, Preferences and Rights (as amended, supplemented, or otherwise modified from time to time, the "Series A Certificate of Designations"), pursuant to which (a) 7,500,000 shares of iQor

Holdings' preferred stock were designated as Series A Convertible Preferred Shares, (b) 2,549,435 shares of iQor Holdings' preferred stock were designated as Series A Shares, and (c) 4,950,565 shares of iQor Holdings' preferred stock were designated as Series A-1 Shares (collectively, the "Series A Preferred Stock").  The Series A Preferred Stock (a) has a par value of $0.001 per share, (b) accrues dividends at an annual rate of eight percent of the Liquidation Value (as defined in the Series A Certificate of Designations) plus accumulated and unpaid dividends, and (c) has a liquidation value of the greater of (x) the Liquidation Value or (y) the amount such holder would be entitled to upon liquidation if such shares were converted to Class A Common Stock.

51.    On March 1, 2012, iQor Holdings issued 175,459 Series A Shares to non-debtor iQor Sponsor Holdings, LLC, and 117,797 Series A Shares to funds directly or indirectly owned, managed, or controlled by Citigroup Venture Capital International Investment GP Limited.  In connection with the Jabil Transaction, on April 1, 2014, iQor Holdings issued 4,388,069 shares of Series A-1 Shares for an aggregate purchase price of approximately $104 million.

52.    The Series A Preferred Stock is primarily held by the Sponsors and is structurally subordinate to the Series SS Preferred Stock.  Each share of Series A Preferred Stock is convertible, at the holder's option at any time, into shares of iQor Holdings' Class A Common Stock by multiplying (a) the number of shares to be converted by (b) the issue price (*i.e.*, $23.87) plus all accrued and unpaid dividends on such Series A Preferred Stock (in the case of Series A-1 Shares, such accrued and unpaid dividends only to the extent accrued and unpaid prior to March 31, 2017) and dividing the result by the Conversion Price (as defined in the Series A Certificate of Designations) then in effect.  As of the Petition Date, 6,931,295 shares of Series A Preferred Stock remains outstanding with an aggregate liquidation preference of approximately $281.5 million.

III.     **Events Leading to the Chapter 11 Filing and Prepetition Restructuring Initiatives.**

      A.     **The Jabil Transaction and Related Financing.**

53.     As described in **<u>Section I</u>** above, companies in the BPO industry constantly face an uphill battle to stay on the cutting edge of new technologies and evolving customer needs. The Debtors' call center business has evolved from live agents handling inbound and outbound telephone calls to omnichannel contact centers that combine automated and live-agent options along with a host of non-voice platforms such as e-mail, SMS text messaging, and web initiated messaging.  Consequently, the Debtors' customers are looking to companies like iQor to develop and implement service offerings and technologies that can meet their customers' evolving expectations.

54.     As noted above, in 2014, the Company entered into the aftermarket product servicing industry through the Jabil Transaction.  At the time of the acquisition, the Company viewed the Jabil Transaction as an opportunity to expand and augment their already robust customer support service offerings.  To finance the Jabil Transaction, the Debtors entered into the First Lien Term Loan Credit Agreement and the Second Lien Term Loan Credit Agreement to partially fund the $725 million purchase price, which consisted of $675 million in cash and the issuance of 50,000 shares of Series S Preferred Stock to Jabil.

55.     While the Jabil Transaction transformed the Company's business, the acquisition underperformed from the time of acquisition and resulted in the overleveraging of the Debtors' capital structure.  Notably, the Company faced economic and operational headwinds related to the Jabil Transaction as a result of (a) a breakdown in certain customer relationships prior to closing the Jabil Transaction, (b) the decline, and eventual demise, of the satellite television market (a significant revenue driver for the Company's product support business), (c) the loss of significant product support customers due to technology-driven disruption and changing

28

conditions in their own markets, and (d) a rapid shift in logistics capabilities in European markets that made a portion of the Company's facilities unnecessary.

**B.      Industry Specific Challenges.**

56.      The aftermarket product support industry is directly impacted by evolving industry standards, technological developments, changes in customer preferences, and frequent new product introductions and enhancements.  As a result of the foregoing, the industry has seen a reduced interest in legacy products and improvement in the quality of new technology devices which has allowed devices to remain in the market longer, resulting in decreased demand for remanufactured and remarketed devices.  Despite the Company's efforts to proactively respond to these industry specific challenges to bring stability to their business and mitigate declines in Company revenue, industry-wide headwinds continue to place a strain on the Company's product support business segment.

57.      Over the past several years, volume pressures from the Debtors' largest product support customer have negatively affected the Debtors' gross revenue and adjusted EBITDA for its product support business.  A steep decline in volume commitments from the Debtors' largest customer in the product support business and the resultant decline in revenue has materially impacted the business segment's overall stability.  Since January 2019, annualized forecasted volumes have declined by 94 percent, and the Company currently expects an $112 million drop in revenue from its largest product support customer in fiscal year 2020.  Given that a significant percentage of the Debtors' product support business sales derive from a relatively small number of core customers, such disruption has been particularly troubling for the business.  The below chart illustrates the declining performance of the Company's product support business over time:



58.     In short, while the Company's customer care/call center business has achieved consistent revenue and adjusted EBITDA growth, the declining revenues of its product support business, coupled with Debtors' increased debt load resulting from the Jabil Transaction, have negatively impacted the Debtors' liquidity position.

### C.     Prepetition Restructuring Initiatives.

#### 1.     Operational Restructuring Efforts and the Staple Street Transaction.

59.     During the past several years, the Company has implemented a range of operational restructuring initiatives, including but not limited to, exiting certain international and U.S. business relationships and downsizing its global workforce.  These actions represented an essential first step in the Company's proactive efforts to maintain its market position and improve performance in the BPO market.  The Company continued its restructuring efforts in 2017 and worked with Credit Suisse Securities (USA) LLC ("Credit Suisse Securities") to prepare various marketing materials for a potential sale process to be conducted in 2017.  In the first half of 2018, however, the Company's product support business continued to underperform as customer volume commitments began to sharply decline.  As a result of the foregoing, the Company restructured its

business to separate its international product business segment from North America and the Philippines to facilitate separate sales.

60.     In connection with the Company's operational restructuring efforts, the Company implemented various management changes, including the replacement of the Debtors' Chief Executive Officer in August 2018. Following these organizational and operational restructuring initiatives, the Company launched a sale process in 2018. Concurrently with these sale efforts, to reduce the liquidity gap resulting from the underperformance of the product support business, the Debtors entered into Amendment No. 2 to the First Lien Credit Agreement in November 2018 to obtain the $40 million Incremental Term Loan.

61.     Following an extensive marketing process, on June 3, 2019, the Company sold a portion of its product support business comprising substantially all of its logistics and product services assets in Europe, Asia, South America, and Canada, and certain non-core assets in the United States, to an affiliate of Staple Street Capital (the "Staple Street Transaction"). The divested business was renamed Ivy Technology and is an independently operated standalone business. The Staple Street Transaction enabled the Company to separate out the loss-creating segments of the product support business (which were ultimately sold to Staple Street Capital), and the Company further established its BPO offerings in North America, which included the customer care business and the profitable, North America-focused segments of the product support business.

62.     While the Staple Street Transaction enabled the Company to shed certain business units that were generating negative EBITDA, the Company's overleveraged capital structure continued to significantly affect the Debtors' operating liquidity. Accordingly, the Company remained focused on pursuing a potential sale of its North American business, reaching out to 105

potential buyers, 64 of which signed non-disclosure agreements.  There was, however, limited interest in the North American enterprise due in part to concerns regarding the Debtors' capital structure and concentration risk and market risk associated with the set-top box market in the product support business.  In response to the foregoing, the Company began evaluating a potential separation of its call center and product support businesses in an effort to generate interest for a sale of the Company.  Despite the Company's efforts, there were no potential transactions that were actionable or offered sufficient consideration to provide greater value to the Company's stakeholders than the transactions contemplated by the RSA and the Plan.

### 2.  Receivables Facility Financing.

63.     As progress in selling the North American business faltered, and a maturity date on a previously existing securitization facility loomed, iQor simultaneously focused its efforts on other avenues to address its capital structure.  On March 9, 2020, iQor, with the assistance of its advisors, entered into the Receivables Facility Agreement, obtaining commitments in the aggregate amount of $80 million to fund a new accounts receivable securitization facility. The proceeds of the Receivables Facility were used to pay down the previously existing securitization facility and to continue the path of liquidity afforded by the prior facility.

### 3.  Appointment of Independent Directors.

64.     In March 2020, to ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the board of directors of iQor Holdings Inc. (the "Board") appointed two independent directors, Jill Frizzley and Ivona Smith (the "Independent Directors"). The Board delegated to the Independent Directors the authority to conduct and oversee an investigation into certain potential claims or causes of action that the Company and/or certain of its stakeholders may possess, including in connection with a potential sale, restructuring, reorganization, or other recapitalization transaction and related financing.  The Independent

Directors engaged Sullivan & Worcester LLP, as legal counsel, to assist with the investigation and in the discharge of the Independent Directors' duties.

65.     The Independent Directors and the professionals acting at their sole direction have commenced an independent investigation (which is anticipated to continue through and after the Petition Date) into the above matters. The Debtors expect that the Independent Directors will be in a position to make a final recommendation whether the releases contemplated by the Plan are appropriate in advance of the Debtors' proposed confirmation hearing.

### 4.     Discussions with Creditors and Bridge Financing.

66.     Against the backdrop of certain market challenges, significant cash interest obligations, declining liquidity, and near-term maturities, iQor viewed a comprehensive debt restructuring as the necessary next step to best position the Company for long-term success. During the first quarter of 2020, the Company and its advisors evaluated various strategic alternatives, including a comprehensive restructuring transaction.  In April 2020, the Debtors and their advisors engaged with their secured lenders in earnest, providing the Debtors' lenders with insight into the Debtors' revised business plan and go-forward strategy.  The Company and its advisors began facilitating a due diligence process and engaged in extensive restructuring discussions with the Ad Hoc Group to build consensus around a deleveraging solution. Specifically, these prepetition restructuring efforts included, among other things:  (a) the provision of a substantial amount of diligence to the Ad Hoc Group and its advisors, including the revised business plan; (b) ongoing dialogue and communication around the iQor enterprise, its operations, and its prospects; and (c) regular telephonic meetings to discuss iQor's potential restructuring path, including both in-court and out-of-court restructuring alternatives.

67.     Following several weeks of discussions amongst the parties, and amidst the COVID-19 pandemic, it became clear that any viable path forward would first need to provide for

the Debtors' immediate cash needs.  Ultimately, the Debtors and their key stakeholders all had the same goal:  to delever the Company in an efficient manner to provide the Debtors' valuable assets and operations an opportunity to move forward as a going concern.  As such, the Debtors and the Ad Hoc Group continued to negotiate a comprehensive deleveraging solution.  On May 29, 2020, the Debtors entered into the Priority Term Loan Agreement, which was funded by existing first lien lenders, and backstopped by members of the Ad Hoc Group, solely in their capacities as first lien lenders.  The Priority Term Loan Facility was designed to provide the Company with "bridge financing" until the implementation of either a chapter 11 filing or out-of-court debt exchange.

68.     The Priority Term Loan Credit Agreement provided for certain milestones, including, among others:  (a) the execution of a restructuring support agreement, including an agreed-upon term sheet for a debtor-in-possession financing facility to be provided by the lenders thereunder; (b) delivery of either first day pleadings, a plan, and disclosure statement; and (c) the commencement of votes on a prepackaged chapter 11 plan.   Importantly, entry into the Priority Term Loan Facility allowed the Debtors to continue to pursue a comprehensive, consensual restructuring transaction with a majority of its secured lenders, ultimately enabling the Debtors to extend their filing runway with enough time to execute the RSA and obtain approval for comprehensive deleveraging transaction.

## IV.     The Restructuring Support Agreement and Chapter 11 Cases.

### A.     Restructuring Support Agreement and the Plan.

69.     The Restructuring Support Agreement contemplates a comprehensive reorganization and recapitalization achieved through the Plan that will result in substantial deleveraging of the Debtors' sheet by approximately $513 million and provide the Debtors with debtor-in-possession financing in the aggregate amount of $130 million, all while paying in full

all non-funded debt claims against the Debtors and providing meaningful recoveries to junior

creditors.  The key financial components of the restructuring are as follows:[8]

- access to debtor-in-possession financing in the form of (a) the Term Loan DIP Facility, to be provided by the Debtors' prepetition first lien lenders, and fully backstopped by members of the Ad Hoc Group and (b) the DIP ABL Facility, to be provided by Wells Fargo, the lender under the Receivables Facility, each pursuant to the terms and conditions set forth in the DIP Term Loan Agreement and the DIP ABL Agreement, respectively;

- access to post-Effective Date financing in the form of a committed Term Loan Exit Facility to be provided by the Debtors' First Lien Term Loan Lenders and an ABL Exit Facility, which is expected to be provided by the Receivables Facility Lender, each of which will be used to refinance the loans under the DIP Facilities and provide the Debtors with additional liquidity upon emergence;

- the issuance on the Effective Date of new term loans to be provided to the Reorganized Debtors by the first lien lenders, in an aggregate principal amount of $300 million; and

- the establishment of a post-emergence management incentive plan to be adopted by the board of directors of reorganized iQor ("Reorganized iQor"), which will (a) include restricted stock units, options, New Common Stock (as defined below), or other rights exercisable, exchangeable, or convertible into New Common Stock representing 10% of the New Common Stock on a fully diluted and fully distributed basis (the "MIP Equity") and (b) include other terms and conditions customary for similar type equity plans (the "Management Incentive Plan").

70.    The Plan contemplates stakeholder recoveries as follows:

- the Term Loan DIP Facility will satisfy all outstanding obligations arising under the Priority Term Loan Facility;

- the DIP ABL Facility will satisfy all outstanding obligations arising under the Receivables Facility;[9]

- all holders of Allowed First Lien Term Loan Claims will receive their pro rata share of (a) 95.75 percent of the common stock of Reorganized iQor (the "New Common Stock") to be issued under the Plan on the Effective Date,

---

[8]    Capitalized terms used but not otherwise defined herein shall have the same meaning as in the Plan.

[9]    In connection with the Debtors' entry into the DIP ABL Facility, any letters of credit outstanding under the Receivables Facility as of the Petition Date will be deemed to have been issued under the DIP ABL Facility.

subject to dilution on account of the Management Incentive Plan, and (b) new term loans under the New Term Loan Facility;

- all holders of Allowed Second Lien Term Loan Claims will receive their pro rata share of 4.25 percent of the New Common Stock, subject to dilution on account of the Management Incentive Plan; and

- all holders of Allowed General Unsecured Claims against the Debtors will be unimpaired and unaffected by the restructuring and will be paid in full in Cash, unless otherwise agreed to by holders of Allowed General Unsecured Claims.

71.     To promote expediency in these chapter 11 cases, the parties to the RSA have agreed to meet certain milestones to ensure a timely emergence from chapter 11.  Pursuant to the RSA, the milestones for Plan confirmation and the occurrence of the Effective Date are as follows: (a) no later than thirty-five (35) days after the Petition Date, the Court shall have entered an order confirming the Plan and approving the Disclosure Statement; and (b) no later than no later than forty-five (45) days after the Petition Date, the Effective Date shall have occurred.[10]

72.     Based on discussions with iQor's advisors, iQor believes that the milestones, in conjunction and consistent with the dates and deadlines set forth in the scheduling motion, appropriately balance the need for the Debtors to swiftly move to emergence with the due process and notice required under the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

**B.     The Debtors' Need for Liquidity and the Proposed DIP Financing.**

73.     The Debtors also seek approval of the DIP Facilities, described more fully in the DIP Motion and the declaration in support of the DIP Motion, each filed concurrently with this Declaration.  I, together with other members of iQor's management and its advisors, have analyzed iQor's cash flow and determined that the DIP Facilities would be required to operate iQor's business smoothly on a postpetition basis, including by providing sufficient liquidity to fund the

---

[10]   The RSA provides that if regulatory approvals associated with a Restructuring Transaction remain pending as of the date that is forty-five (45) days after the Petition Date, then the Effective Date milestone will automatically be extended to the date that is the third business day following receipt of all regulatory approvals

administrative costs of the chapter 11 process. This analysis also included, among other things, assessing the potential acceleration of demands on available liquidity following the commencement of these chapter 11 cases. This process involved extensive marketing efforts undertaken by Evercore, including the solicitation of non-binding preliminary proposals to participate in the DIP financing to various interested parties. The Debtors are pleased to report that such process has been a success. iQor secured the DIP Facilities, as further described in the DIP Motion. The DIP Facilities' terms provide for approximately $130 million in aggregate financing, which consists of the $80 million DIP ABL Facility (which will satisfy all outstanding obligations under the Receivables Facility),[11] the $50 million Term Loan DIP Facility (which will satisfy all outstanding obligations under the Priority Term Loan Facility), and the consensual use of cash collateral.

74.     As detailed further in Evercore's declaration in support of the DIP Facilities, I believe that the DIP Facilities will provide the Debtors with the necessary liquidity to fund their business operations and administrative expenses during the contemplated time period of these chapter 11 cases, with minimal disruption. As more fully discussed in iQor's cash management motion, filed contemporaneously herewith, iQor's day-to-day operations depend on borrowings under the Receivables Facility, and it is therefore vital that iQor has continued access to such borrowings. The DIP ABL Facility allows for a smooth transition from the Receivables Facility to the DIP ABL Facility, providing the Debtors continued access to a revolving credit facility during the pendency of these chapter 11 cases.

---

[11]   In connection with the Debtors' entry into the DIP ABL Facility, any letters of credit outstanding under the Receivables Facility as of the Petition Date will be deemed to have been issued under the DIP ABL Facility.

75.     If approved, I believe that the DIP Facilities will allow iQor to fund the cost of these chapter 11 cases, provide ongoing working capital needs, and pay its employees, vendors, and others in iQor's value chain, preventing any disruptions in the flow of customer engagement and sales that might otherwise result.  Without the DIP Facilities, I believe that substantial value degradation would occur as a result of iQor's inability to continue ordinary course operations, which would not only impact revenue generation, but also risk losing the confidence of critical vendors and customers.  Critical vendors may shorten trade terms, causing liquidity constraints, and required capital expenditures would be delayed, negatively impacting operational results.  The lack of liquidity ultimately could result in the closure of certain call center facilities and the loss of good-paying jobs for thousands of iQor's employees.  Moreover, the DIP Facilities provide the Debtors with a path forward that, when coupled with the restructuring transactions contemplated by the RSA and Plan, will reduce iQor's annual debt service obligations, freeing up liquidity in the future to meet operational needs.  Accordingly, and as detailed further in Evercore's declaration in support of the DIP Facilities, I believe that iQor's entry into the DIP Facilities will provide critical liquidity and is in the best interest of iQor's stakeholders and the Debtors' estates.

## C.     Committed Exit Facilities.

76.     On the Effective Date, the Debtors will enter into the committed Term Loan Exit Facility and expect to enter into the ABL Exit Facility, the proceeds of which will be used to satisfy all obligations under the DIP Facilities and to fund the Debtors' operations upon emergence from these chapter 11 cases.  In accordance with the financial projections prepared by the Debtors with the assistance of their advisors, the Debtors believe the financing available pursuant to the Exit Facilities will allow them to operate with stability, and successfully fund a go-forward business plan that fully harnesses the benefits of the Plan.

**D.     New Term Loan Facility.**

77.     Additionally, under the RSA, Reorganized iQor will enter into the New Term Loan Facility on the Effective Date, which provides for the issuance of new term loans in an aggregate principal amount of $300 million.  The New Term Loan Facility will be provided to the Debtors by the first lien lenders on the terms and conditions set forth in New Term Loan Facility Documents, which shall otherwise be consistent with the RSA and Term Sheet.

**V.     Evidentiary Support for First Day Motions.**

78.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions include the following:

**<u>Administrative and Procedural Motions</u>**

a.     Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief [Docket No. 2];

b.     Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, And (C) Redact Certain Personal Identification Information and (II) Granting Related Relief [Docket No. 4];

c.     Debtors Emergency Application for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions as Claims and Noticing Agent, and (II) Granting Related Relief [Docket No. 5]; and

d.     Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving Disclosure Statement, (III) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (IV) Approving the Solicitation Procedures, (V) Approving the Combined Notice, and (VI) Waiving the Requirements that the U.S. Trustee Convene a Meeting of

Creditors and the Debtors File Schedules and SOFAs [Docket No. 52].

**Operational Motions**

a.      Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Honor Certain Prepetition Obligations to Customers and (B) Continue Certain Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief [Docket No. 10];

b.      Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Trade Claims and (II) Granting Related Relief [Docket No. 13];

c.      Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock and Preferred Stock and (II) Granting Related Relief [Docket No. 14];

d.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (C) Continue the Surety Bond Program, and (II) Granting Related Relief [Docket No. 15];

e.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief [Docket No. 16];

f.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief [Docket No. 27];

g.      Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief [Docket No. 28];

h.   Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief [Docket No. 34]; and

i.   Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief [Docket No. 54].

79.     The First Day Motions seek authority to, among other things, obtain debtor-in-possession financing on an interim basis, honor employee-related wages and benefits obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to provide the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

80.     Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

81.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors

to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully implementing the Debtors' chapter 11 strategy.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are

true and correct.

Dated:  September 11, 2020          */s/ David A. Kaminsky*
_____
                                   Name:  David A. Kaminsky
                                   Title:   Chief Financial Officer
                                   iQor Holdings Inc.

**Exhibit A**

**RSA**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.02, this "**Agreement**") is made and entered into as of July 23, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (v) of this preamble, collectively, the "**Parties**"):[1]

i.    iQor Holdings Inc., a company incorporated under the Laws of Delaware ("**Parent**"), and each of its subsidiaries listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Priority Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting Priority Lenders**");

iii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, First Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 of this Agreement.

Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting First Lien Term Lenders**");

iv.   the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iv), collectively, the "**Consenting Second Lien Term Lenders**" and, together with the Consenting Priority Lenders and the Consenting First Lien Term Lenders, the "**Consenting Lenders**"); and

v.   the undersigned investment funds and affiliates of iQor Sponsor Holdings, HGGC, SCPC, and TRG that directly or indirectly hold, or are investment advisors, sub-advisors, or managers of discretionary accounts that hold, Interests that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties (the Entities in this clause (v), collectively, the "**Sponsors**" and, together with the other Entities in clauses (ii) through (iv), the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions by (a) undertaking a recapitalization of the Company Parties effectuated through an out-of-court restructuring (an "**Out-of-Court Restructuring**") or (b) if the Restructuring Transactions cannot be implemented on an out-of-court basis, commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court by means of the Plan (an "**In-Court Restructuring**" and, the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.**   *Definitions and Interpretation*.

1.01.   Definitions.   The following terms shall have the following definitions:

"**ABL DIP Credit Agreement**" means that certain debtor-in-possession credit agreement evidencing the ABL DIP Facility.

"**ABL DIP Facility**" means the $80,000,000 debtor-in-possession credit facility to be provided to the Company Parties in accordance with the terms, and subject to the conditions, set forth in the ABL DIP Credit Agreement and the DIP Orders.

"**ABL DIP Facility Lender**" means Wells Fargo Bank, N.A.

"**ABL Exit Credit Agreement**"  means that certain credit agreement evidencing the ABL Exit Facility.

"**ABL Exit Facility**" means the $80,000,000 credit facility to be provided to the Company Parties in accordance with the terms, and subject to the conditions, set forth in the ABL Exit Credit Agreement.

"**ABL Exit Facility Documents**" means, collectively, the ABL Exit Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**ABL Exit Facility Lender**" means Wells Fargo Bank, N.A.

"**Ad Hoc Group**" means those Consenting Priority Lenders, Consenting First Lien Term Lenders, and Consenting Second Lien Term Lenders that are members of the ad hoc group represented by the Ad Hoc Group Advisors.

"**Ad Hoc Group Advisors**" means Gibson, Dunn & Crutcher LLP, as legal counsel to the Ad Hoc Group, and Greenhill & Co., LLC, as financial advisor to the Ad Hoc Group.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the First Lien Term Loan Credit Agreement and/or the Second Lien Term Loan Credit Agreement, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 15.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt

investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral**" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Interests in, a Company Party, including the Priority Term Loan Claims, the First Lien Term Loan Claims, the Second Lien Term Loan Claims, and the Interests.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting First Lien Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Priority Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Second Lien Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Second Lien Term Lender Consent Right**" means the Required Consenting Second Lien Term Lenders' right to consent to or approve any of the Definitive Documents (or any amendment, modifications, or supplements thereto) and shall apply solely to the extent any Definitive Document, (x) materially and adversely affects, directly or indirectly, the economic rights and waivers, or otherwise modifies or affects the releases and injunctions proposed to be

granted to, or received by the Consenting Second Lien Term Lenders pursuant to this Agreement (including the Restructuring Term Sheet) or (y) materially and adversely affects, directly or indirectly, the obligations that the Consenting Second Lien Term Lenders may have pursuant to this Agreement, the Restructuring Term Sheet, or the Plan, as applicable, in each case, which consent shall not be unreasonably withheld, conditioned or delayed.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Credit Agreements**" means, collectively, the ABL DIP Credit Agreement and the Term Loan DIP Credit Agreement.

"**DIP Documents**" means, collectively, the DIP Credit Agreements and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**DIP Facilities**" means, collectively, the ABL DIP Facility and the Term Loan DIP Facility.

"**DIP Orders**" means the interim or final, as applicable, order of the Bankruptcy Court setting forth the terms of debtor-in-possession financing and use of cash collateral, which shall be consistent with the Term Loan DIP Facility Term Sheet and the term sheet governing the ABL DIP Facility.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Enforcement Action**" means any action of any kind, except as necessary to file and defend any Company Claims/Interests in conjunction with the Chapter 11 Cases, to (a) exercise or enforce any right under any guarantee or any right in respect of any "Lien" as defined in the Priority Term Loan Credit Agreement, the First Lien Term Loan Credit Agreement, or the Second Lien Term Loan Credit Agreement (including, for the avoidance of doubt, any security interest granted under the Priority Term Loan Credit Agreement, the First Lien Term Loan Credit Agreement, or the Second Lien Term Loan Credit Agreement), in each case granted in relation to (or given in support of) all or any part of any Company Claims/Interests or (b) sue, claim or institute or continue legal proceedings against any Company Party or Sponsor.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**First Lien Term Loan Claim**" means any Claim on account of a First Lien Term Loan.

"**First Lien Term Loan**" means any loan outstanding under the First Lien Term Loan Credit Agreement.

"**First Lien Term Loan Credit Agreement**" means that certain First Lien Credit Agreement, dated as of April 1, 2014, by and among Parent, as holdings, iQor US Inc., as borrower, Wilmington Savings Fund Society, FSB, as successor administrative and collateral agent, the guarantors named therein, and the lenders named therein and party thereto from time to time, as amended, modified, or otherwise supplemented from time to time.

"**HGGC**" means HGGC, LLC.

"**Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**iQor Sponsor Holdings**" means iQor Sponsor Holdings, LLC.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit C**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**New Term Loan Agreement**" means that certain credit agreement evidencing the New Term Loan Facility.

"**New Term Loan Documents**" means, collectively, the New Term Loan Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the New Term Loan Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

"**New Term Loan Facility**" means the $300,000,000 amended credit facility to be provided to the Reorganized Debtors in accordance with the terms, and subject to the conditions, set forth in this Agreement and the Restructuring Term Sheet.

"**Out-of-Court Effective Date**" means the date on which the conditions precedent to an Out-of-Court Restructuring have been satisfied or otherwise waived in writing and the Restructuring Transactions are implemented in accordance with definitive documentation.

"**Out-of-Court Restructuring**" has the meaning set forth in the preamble to this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions.

"**Plan Effective Date**" means the date on which the Plan becomes effective in accordance with its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Priority Term Loan**" means any loan outstanding under the Priority Term Loan Credit Agreement.

"**Priority Term Loan Claim**" means any Claim on account of a Priority Term Loan.

"**Priority Term Loan Credit Agreement**" means that certain Super-Priority Term Loan Credit Agreement, dated as of May 29, 2020, by and among Parent, as holdings, iQor US Inc., as borrower, Wilmington Savings Fund Society, FSB, as administrative and collateral agent, the guarantors named therein, and the lenders named therein and party thereto from time to time, as amended, modified, or otherwise supplemented from time to time.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Reorganized Debtors**" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date.

"**Required Consenting First Lien Term Lenders**" means, as of the relevant date, Consenting First Lien Term Lenders holding at least 50.01% of the aggregate outstanding principal amount of First Lien Term Loan Claims that are held by Consenting First Lien Term Lenders; *provided that*, to the extent the consent of the Required Consenting First Lien Term Lenders is required with respect to any changes, modifications, or amendments to the underlying economics of the Restructuring Transaction, all such changes, modifications, or amendments shall require the consent of Consenting First Lien Term Lenders holding at least 66.67% of the aggregate

outstanding principal amount of First Lien Term Loan Claims that are held by Consenting First Lien Term Lenders.

"**Required Consenting Priority Lenders**" means, as of the relevant date, Consenting Priority Lenders holding at least 50.01% of the aggregate outstanding principal amount of Priority Term Loan Claims that are held by Consenting First Lien Term Lenders; *provided that*, to the extent the consent of the Required Consenting Priority Lenders is required with respect to any changes, modifications, or amendments to the underlying economics of the Restructuring Transaction, all such changes, modifications, or amendments shall require the consent of Consenting Priority Lenders holding at least 66.67% of the aggregate outstanding principal amount of Priority Loan Claims that are held by Consenting Priority Lenders.

"**Required Consenting Second Lien Term Lenders**" means, as of the relevant date, Consenting Second Lien Term Lenders holding at least 50.01% of the aggregate outstanding principal amount of Second Lien Term Loan Claims that are held by Consenting Second Lien Term Lenders; *provided that*, to the extent the consent of the Required Consenting Second Lien Term Lenders is required with respect to any changes, modifications, or amendments to the underlying economics of the Restructuring Transaction, all such changes, modifications, or amendments shall require the consent of Consenting Second Lien Term Lenders holding at least 66.67% of the aggregate outstanding principal amount of Second Lien Term Loan Claims that are held by Consenting Second Lien Term Lenders.

"**Required Consenting Lenders**" means, collectively, the Required Priority Lenders, the Required Consenting First Lien Term Lenders, and the Required Consenting Second Lien Term Lenders.

"**Required Consenting Stakeholders**" means, collectively, the Required Consenting Lenders and each of the Sponsors.

"**Required Term DIP Lenders**" means, as of the relevant date, Term DIP Lenders holding at least 50.01% of the aggregate outstanding principal amount of Term DIP Loans that are held by Term DIP Lenders; *provided that*, to the extent the consent of the Required Term DIP Lenders is required with respect to any changes, modifications, or amendments to the underlying economics of the Restructuring Transaction, all such changes, modifications, or amendments shall require the consent of Term DIP Lenders holding at least 66.67% of the aggregate outstanding principal amount of Term DIP Loan Claims that are held by DIP Term Lenders.

"**Restructuring Effective Date**" means the Out-of-Court Effective Date or the Plan Effective Date, as applicable.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**SCPC**" means SIH Capital Partners (Combined), LLC.

"**Second Lien Term Loan Claim**" means any Claim on account of a Second Lien Term Loan.

"**Second Lien Term Loan**" means any loan outstanding under the Second Lien Term Loan Credit Agreement.

"**Second Lien Term Loan Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of April 1, 2014, by and among Parent, as holdings, iQor US Inc., as borrower, Credit Suisse AG, Cayman Islands Branch, as administrative and collateral agent, the guarantors named therein, and the lenders named therein and party thereto from time to time, as amended, modified, or otherwise supplemented from time to time.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan.

"**Sponsors**" has the meaning set forth in the preamble to this Agreement.

"**Sponsor Consent Right**" means the right of the Sponsors to consent to or approve any of the Definitive Documents (or any amendment, modifications or supplements thereto) that (i) adversely affects, directly or indirectly, in any respect the economic waivers, or otherwise modifies or affects the releases or exculpation proposed to be granted to, or received by, the Sponsors pursuant to this Agreement (including the Restructuring Term Sheet) or (ii) adversely affects, directly or indirectly, the obligations that the Sponsors may have pursuant to this Agreement, the Restructuring Term Sheet or the Plan, as applicable, in each case, which consent shall not be unreasonably withheld, conditioned or delayed.

"**Term DIP Lenders**" means the lenders under the Term Loan DIP Facility.

"**Term Loan DIP Credit Agreement**" means that certain debtor-in-possession credit agreement evidencing the Term Loan DIP Facility.

"**Term Loan DIP Facility**" means the $50,000,000 debtor-in-possession credit facility to be provided to the Company Parties in accordance with the terms, and subject to the conditions, set forth in the Term Loan DIP Facility Term Sheet and the DIP Orders.

"**Term Loan DIP Facility Term Sheet**" means the term sheet attached to the Restructuring Term Sheet as Annex A thereto, as such term sheet may be amended, modified or supplemented in accordance with Section 14 hereof.

"**Term Loan Exit Facility**" means the $75,000,000 to $97,500,000 exit facility to be provided to the Company Parties in accordance with the terms, and subject to the conditions, set forth in this Agreement and the Term Loan Exit Facility Term Sheet.

"**Term Loan Exit Facility Credit Agreement**" means that certain credit agreement evidencing the Exit Facility in accordance with the terms, and subject to the conditions, set forth in this Agreement and the Term Loan Exit Facility Term Sheet.

"**Term Loan Exit Facility Documents**" means, the agreements memorializing the Term Loan Exit Facility, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Term Loan Exit Facility.

"**Term Loan Exit Facility Term Sheet**" means the term sheet attached to the Restructuring Term Sheet as Annex B thereto, as such term sheet may be amended, modified or supplemented in accordance with Section 14 hereof.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, or 12.04.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

"**TRG**" means TRG Management LP.

1.02.    Interpretation.  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof shall not be effective in regard to the interpretation hereof.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of

such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 15.12 other than counsel to the Company Parties.

**Section 2.**     *Effectiveness of this Agreement*.   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties and the Sponsors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Lenders;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties:

(i)     holders of at least two-thirds (66.7%) of the aggregate outstanding principal amount of First Lien Term Loans;

(ii)     holders of at least two-thirds (66.7%) of the aggregate outstanding principal amount of Priority Term Loans; and

(iii)     holders of at least one-half (50.0%) of the aggregate outstanding principal amount of Second Lien Term Loans;

(c)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 15.12 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred; and

(d)     the Company Parties shall have paid all reasonable and documented fees and expenses and all agreed and unpaid professional retainer amounts of the Ad Hoc Group Advisors

for which an invoice has been received by the Company Parties on or before the date that is one (1) Business Day prior to the Agreement Effective Date;

This Agreement shall be effective from the Agreement Effective Date until validly terminated pursuant to the terms of this Agreement. To the extent that a Consenting Stakeholder holds, as of the date hereof or thereafter, multiple Company Claims/Interests, such Consenting Stakeholder shall be deemed to have executed this Agreement in respect of all of its Company Claims/Interests.

**Section 3.**   *Definitive Documents*.

3.01.   The Definitive Documents governing the Restructuring Transactions shall include the following: (a) this Agreement; (b) documents implementing and achieving the Restructuring Transactions; (c) the Plan; (d) the Confirmation Order; (e) the Disclosure Statement; (f) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (g) the First Day Pleadings and all orders sought pursuant thereto; (h) the DIP Documents; (i) the DIP Orders; (j) the Term Loan Exit Facility Documents; (k) the New Term Loan Documents; (j) the ABL Exit Facility Documents; and (k) the Plan Supplement.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 14. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to (a) the Company Parties, (b) the Required Term DIP Lenders, (c) the Required Consenting Priority Lenders, (d) the Required Consenting First Lien Term Lenders, (e) the Required Consenting Second Lien Term Lenders (solely to the extent required under the Required Consenting Second Lien Term Lender Consent Right), and (f) the Sponsors (solely to the extent required under the Sponsor Consent Right); *provided* that any organizational documents or other corporate governance documents of the Reorganized Company shall be in form and substance reasonably acceptable to only the Company Parties and the Required Consenting First Lien Term Lenders.

**Section 4.**   *Milestones.*   The following Milestones shall apply to this Agreement unless extended or waived in writing by the Company Parties and the Required Consenting Lenders:

(a)   no later than August 31, 2020, the Company Parties shall commence solicitation of consents for the Out-of-Court Restructuring or votes on the Plan; and

(b)   unless the Out-of-Court Effective Date has occurred:

(i)   no later than September 9, 2020, the Petition Date shall have occurred;

(ii)   on the Petition Date, the Company Parties shall file (i) the Disclosure Statement, (ii) the Plan (votes for which shall have already been solicited), and (iii) a motion seeking entry of an order scheduling a combined hearing with respect to confirmation of the Plan and approval of the Disclosure Statement;

(iii)    no later than two (2) business days after the Petition Date, the DIP Order shall have been entered on an interim basis;

(iv)    no later than thirty-five (35) days after the Petition Date, the DIP Order shall have been entered on a final basis;

(v)    no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Disclosure Statement; and

(vi)    no later than forty-five (45) days after the Petition Date, the Plan Effective Date shall have occurred; provided that, if regulatory approvals associated with a Restructuring Transaction remain pending as of such date, this date shall automatically be extended to the date that is the third Business Day following receipt of all regulatory approvals.

**Section 5.**    *Commitments of the Consenting Stakeholders.*

5.01.    <u>Affirmative Commitments</u>.    During the Agreement Effective Period, each Consenting Stakeholder, severally, and not jointly, agrees in respect of all of its Company Claims/Interests to:

(a)    support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(b)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(c)    use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 5.02 of this Agreement;

(d)    give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions;

(e)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party;

(f)    cooperate and coordinate with the Company Parties and to use commercially reasonable efforts to support and consummate the Restructuring Transactions, as applicable, and to execute any document and give any notice, order, instruction or direction necessary to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions, including, for the avoidance of doubt, using reasonable best efforts to obtain any necessary federal, state and local regulatory approvals necessary to consummate the Restructuring Transactions; and

(g)      negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring Transactions.

5.02.    <u>Negative Commitments</u>.  During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees in respect of all of its Company Claims/Interests, that it shall not directly or indirectly, and shall not direct any other person or Entity to:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      propose, file, support, or vote for any Alternative Restructuring Proposal;

(c)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(d)      take any Enforcement Actions or exercise any right or remedy for the enforcement, collection, or recovery of any of the Company Claims/Interests including rights or remedies arising from or asserting or bringing any claims under or with respect to the Priority Term Loan Credit Agreement, the First Lien Term Loan Credit Agreement, or the Second Lien Term Loan Credit Agreement;

(e)      object to, delay, impede or take any other action to interfere with Bankruptcy Court approval of (i) the Company Parties' retention of professionals in the Chapter 11 Cases, and (ii) fee applications seeking allowance or payment of fees and expenses incurred by such professionals, *provided* that such fees and expenses are incurred pursuant to and in accordance with the terms of the engagement letters between such professionals and the Company Parties in effect as of the Agreement Effective Date;

(f)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated in this Agreement against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(g)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.03.    <u>Commitments with Respect to Chapter 11 Cases</u>.  During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(a)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(b)    not change, withdraw, amend, or revoke (or cause or direct to be changed, withdrawn, amended, or revoked) any such vote described in section (a) above or release described in clause (c) below;

(c)    agree to provide, and to not opt out of or object to, the releases set forth in the Plan;

(d)    support all of the debtor and third-party releases, injunctions, discharge, indemnity, and exculpation provisions provided in the Plan, substantially consistent with those set forth in Annex 1 to the Restructuring Term Sheet;

(e)    not directly or indirectly, through any person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; and

(f)    support and take all actions reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement.

5.04.    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, severally, and not jointly, agrees that it will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.**    ***Additional Provisions Regarding the Consenting Stakeholders' Commitments***. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; and (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 7.**    ***Commitments of the Company Parties***.

7.01.    <u>Affirmative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)    use reasonable best efforts to (i) pursue the Restructuring Transactions on the terms and in accordance with the Milestones set forth in this Agreement, including by negotiating the

Definitive Documents in good faith, and (ii) cooperate with the Consenting Stakeholders to obtain necessary Bankruptcy Court approval of the Definitive Documents to consummate the Restructuring Transactions;

(b)     support and take all commercially reasonable actions necessary or reasonably requested by the other Parties to facilitate the solicitation, confirmation, approval, and consummation of the Restructuring Transactions, as applicable, to the extent consistent with the terms and conditions in this Agreement;

(c)     not take any action, and not encourage any other person or entity to, take any action, directly or indirectly, that would reasonably be expected to breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with the acceptance or implementation of the Restructuring Transactions, this Agreement, or the Plan;

(d)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(e)     support and seek approval of all of the debtor and third-party releases, injunctions, discharge, indemnity, and exculpation provisions provided in the Plan, substantially consistent with those set forth in <u>Annex 1</u> to the Restructuring Term Sheet;

(f)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(g)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(h)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(i)     to the extent reasonably practicable, provide counsel for the Ad Hoc Group a review period of (i) at least three (3) calendar days (or such shorter review period as is necessary or appropriate under the circumstances) prior to the date when the Company Parties intend to file any Definitive Document with the Bankruptcy Court and (ii) at least one (1) calendar day (or such shorter review period as necessary or appropriate) prior to the date when the Company intends to file any other material pleading with the Bankruptcy Court (but excluding monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto);

(j)     to the extent applicable, object to any motion filed with the Bankruptcy Court by any person (i) seeking the entry of an order terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization or (ii) seeking the entry of an order terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief was granted,

would have a material adverse effect on or delay the consummation of the Restructuring Transactions; and

(k)      to the extent applicable, not file any pleading seeking entry of an order, and object to any motion filed with the Bankruptcy Court by any person seeking the entry of an order, (i) directing the appointment of an examiner or a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) for relief that (x) is inconsistent with this Agreement in any material respect or (y) would reasonably be expected to frustrate the purposes of this Agreement, including by preventing or delaying the consummation of the Restructuring Transactions.

7.02.   <u>Negative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(d)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan.

**Section 8.**      *Additional Provisions Regarding Company Parties' Commitments*.

8.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement.  Notwithstanding anything to the contrary herein, each Consenting Stakeholder reserves its rights to challenge any action taken in the exercise of such fiduciary duties.

8.02.   Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or

negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided that* if any Company Party receives an Alternative Restructuring Proposal, the Company Parties shall provide copies of any such Alternative Restructuring Proposal received to the financial and legal advisors of the Ad Hoc Group no later than two (2) Business Days following receipt thereof by any of the Company Parties.

8.03.   Notwithstanding anything to the contrary herein, nothing in this Agreement shall create or impose any additional fiduciary obligations upon any Company Party or any of the Consenting Stakeholders, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party, that such entities did not have prior to the Agreement Effective Date.

8.04.   Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**     *Transfer of Company Claims/Interests*.

9.01.   During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless either:  (a) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement; or (b) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claims/Interests transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.  Notwithstanding the foregoing, in the case of any Interests, no Consenting Stakeholder shall Transfer any Interests that would, in the reasonable determination of Parent, result in an "ownership change" of Parent within the meaning of Section 382 of the Internal Revenue Code of 1986, as amended.

9.02.   Upon compliance with the requirements of Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 9.01 shall be void *ab initio*.

9.03.   This Section 9 shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided, however*, that

(a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

9.04.    This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.   Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 9.01; and (c) the Transfer otherwise is permitted under Section 9.01.   To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

9.06.    The Company Parties understand that the Consenting Lenders are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Lender that principally manage and/or supervise the Consenting Lender's investment in the Company Parties, and shall not apply to any other trading desk or business group of the Consenting Lender, so long as they are not acting at the direction or for the benefit of such Consenting Lender or in connection with such Consenting Lender's investment in the Company Parties.

9.07.    Further, notwithstanding anything in this Agreement to the contrary, the Parties agree that, in connection with the delivery of signature pages to this Agreement by a Consenting Stakeholder that is a Qualified Marketmaker before the occurrence of conditions giving rise to the effective date for the obligations and the support hereunder, such Consenting Stakeholder shall be a Consenting Stakeholder hereunder solely with respect to the Company Claims/Interests listed on such signature pages and shall not be required to comply with this Agreement for any other Company Claims/Interests it may hold from time to time in its role as a Qualified Marketmaker.

9.08.   Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.** *Representations and Warranties of Consenting Lenders*.  Each Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Lender executes and delivers this Agreement and as of the Restructuring Effective Date:

(a)   it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of Company Claims/Interests other than those reflected in, such Consenting Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9);

(b)   it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)   such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)   it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)   solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Lender in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 11.** *Mutual Representations, Warranties, and Covenants*.  Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Restructuring Effective Date:

(a)   it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.**      *Termination Events*.

12.01.   <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated (w) with respect to the Consenting Priority Lenders, by the Required Consenting Priority Lenders; (x) with respect to the Consenting First Lien Term Lenders, by the Required Consenting First Lien Term Lenders; (y) with respect to the Consenting Second Lien Term Lenders, by the Required Consenting Second Lien Term Lenders, solely with respect to the following clauses (b) through (e), (g) through (j), and (m) through (p) in this Section 12.01; and (z) with respect to the Sponsors, solely with respect to the following clauses (b) through (e), (f), solely to the extent such failure in (f) is the result of any act, omission, or delay on the part of the Consenting Lenders in violation of its obligations under this Agreement, (g) through (k), and (m) through (p) in this Section 12.01, by each Sponsor, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 15.12 of this Agreement upon the occurrence of the following events:

(a)      the loss by the Company Parties of (i) any vendor financing programs, solely to the extent the Company Parties do not obtain alternative financing reasonably satisfactory to the Required Consenting Lenders within 30 days following such loss or (ii) material call center customers (*i.e.*, top ten (10) call center customers as disclosed to the Ad Hoc Group Advisors);

(b)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after such terminating Required Consenting Stakeholders transmit a written notice in accordance with Section 15.12 hereof detailing any such breach;

(c)      the making publicly available, modification, amendment, or filing of any of the Definitive Documents without the consent of the applicable Required Consenting Stakeholders in accordance with this Agreement;

(d)      any Company Party's (i) withdrawal of the Plan, (ii) public announcement of its intention not to support the Restructuring Transactions, or (iii) filing, public announcement, or execution of a definitive written agreement with respect to an Alternative Restructuring Proposal;

(e)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.12 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(f)      the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, which remains unsatisfied for five (5) Business Days, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement;

(g)      if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(h)      an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or consummate the Restructuring Transactions;

(i)      upon the occurrence of a termination event in Section 12.02 of this Agreement;

(j)      any Company Party files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and such motion has not been withdrawn within five (5) Business Days of receipt by the Company Parties of written notice from the Required Consenting Lenders that such motion or pleading is inconsistent with this Agreement;

(k)      entry of a DIP Order that is not acceptable to the Required DIP Term Lenders;

(l)      a Company Party files any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Company Claims/Interests or assert any other cause of action against the Consenting Lenders or with respect or relating to such Company Claims/Interests, the

Priority Term Loan Credit Agreement, First Lien Term Loan Credit Agreement, the Second Lien Term Loan Credit Agreement, or any Loan Document (as such term is defined in each of the foregoing credit agreements) or the prepetition liens securing the Company Claims/Interests or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Company Claims/Interests or asserting any other cause of action against the Consenting Lenders or with respect or relating to such Company Claims/Interests or the prepetition liens securing the Company Claims/Interests;

(m)     the occurrence of any Event of Default under the DIP Order or the Term Loan DIP Facility, as applicable, that has not been cured (if susceptible to cure) or waived by the applicable percentage of Term DIP Lenders in accordance with the terms of the DIP Order or the Term Loan DIP Facility, as applicable;

(n)     the Company Parties lose the exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(o)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fifteen (15) Business Days after entry of such order;

(p)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement; or

(q)     the failure by the Company Parties to obtain a formal commitment from the ABL Exit Facility Lenders with respect to the ABL Exit Facility prior to the filing of the Plan Supplement in the Chapter 11 Cases.

12.02.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 15.12 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect of any provision set forth in this Agreement by one or more of the Consenting First Lien Term Lenders holding an amount of First Lien Term Loans that would result in non-breaching Consenting First Lien Term Lenders holding less than two-thirds (66.7%) of the aggregate outstanding principal amount of First Lien Term Loans that remains uncured for a period of ten (10) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.12 hereof detailing any such breach;

(b)     the breach in any material respect of any provision set forth in this Agreement by one or more of the Consenting Second Lien Term Lenders holding an amount of Second Lien Term Loans that would result in non-breaching Consenting Second Lien Term Lenders holding less than one-half (50.0%) of the aggregate outstanding principal amount of Second Lien Term Loans that remains uncured for a period of ten (10) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.12 hereof detailing any such breach;

(c)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(d)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.12 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(e)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fifteen (15) Business Days after entry of such order.

12.03.   <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

12.04.   <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Restructuring Effective Date.

12.05.   <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 12.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder or the ability of any

Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.   No purported termination of this Agreement shall be effective under this Section 12.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(c) or Section 12.02(e).  Nothing in this Section 12.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(c).

     12.06.   The Company Parties acknowledge that after the Petition Date, the giving of notice of termination by any Party pursuant to this Agreement shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code; *provided* that nothing herein shall prejudice any Party's right to argue that the giving of notice of termination was not proper under the terms of this Agreement.

**Section 13.**    *Fees and Expenses.*   The Company Parties shall pay or reimburse all reasonable and documented fees and expenses of the Ad Hoc Group Advisors, within five (5) Business Days of receipt of an invoice therefor, unless otherwise directed by an order of the Bankruptcy Court.

**Section 14.**    *Amendments and Waivers*.

     (a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

     (b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the Required Consenting Stakeholders; *provided*, *however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement.

     (c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

     (d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.**    *Miscellaneous*.

     15.01.   <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for

the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03.  <u>Further Assurances</u>.  Subject to the terms of this Agreement, each Party hereby covenants and agrees to cooperate with each other in good faith with respect to the pursuit, approval, implementation, and consummation of the Restructuring Transactions and the Plan, as well as the negotiation, drafting, execution, and delivery of documents (including any related orders, agreements, instruments, schedules, or exhibits) described in this Agreement or the Definitive Documents or otherwise necessary or desirable to facilitate the Restructuring Transactions in accordance with this Agreement and the Definitive Documents.  Furthermore, subject to the terms hereof, each Party shall take such action as may be reasonably necessary or reasonably requested by another Party to carry out the purpose and intent of this Agreement, including facilitating any necessary regulatory filings, and shall refrain from taking any action that would frustrate the purpose and intent of this Agreement.

15.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:   (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08.  Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09.  Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

15.10.  Survival.  Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in Section 13 shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

15.11.  Relationship Among the Parties.  It is understood and agreed that no Party to this Agreement has any duty of trust or confidence in any form with any other Party, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them.  In this regard, it is understood and agreed that any Party to this Agreement may trade in Company Claims/Interests without the consent of the Company Parties, as the case may be, or any other Party, subject to applicable securities laws, the terms of any applicable non-disclosure agreement, and the terms of this Agreement; *provided* that no Party shall have any responsibility for any such trading by any other Party by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.

15.12.  Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

iQor Holdings Inc.
200 Central Avenue, 7th Floor
St. Petersburg, Florida 33701
Attention:  Runa Rosenfield, General Counsel and Corporate Secretary
E-mail address:  runa.rosenfield@iqor.com

with a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Christopher J. Marcus, P.C. and Rachael M. Bazinski
E-mail addresses:  christopher.marcus@kirkland.com;
rachael.bazinski@kirkland.com

(b)      if to a Consenting Lender, to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention:  Scott Greenberg, Steven Domanowski, and Jeremy Evans
Email addresses:  sgreenberg@gibsondunn.com;
sdomanowski@gibsondunn.com; jevans@gibsondunn.com

(c)      if to iQor Sponsor Holdings, to:

iQor Sponsor Holdings, LLC
200 Central Avenue, 7th Floor
St. Petersburg, Florida 33701
Attention:  Runa Rosenfield, General Counsel and Corporate Secretary
E-mail address:  runa.rosenfield@iqor.com

(d)      if to HGGC, to:

HGGC, LLC
1950 University Avenue
Palo Alto, California 94303
Attention:  Kurt Krieger
Email address:  kak@hggc.com

(e)      if to SCPC, to:

SIH Capital Partners (Combined), LLC
399 Park Avenue
New York, New York 10022
Attention:  Legal Notifications
Email address:  legalnotices@scpc.llc

(f)      if to TRG, to:

TRG Management LP
65 East 55th Street, 15th Floor
New York, New York 10022

28

Attention:  Jay Cohen
Email address:  jay.cohen@rohatyngroup.com

Any notice given by delivery, mail, or courier shall be effective when received.

15.13.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

15.14.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.15.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.16.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

15.17.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.18.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.19.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.20.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

15.21.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 14, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

15.22.  <u>Other Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:  (i) when calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; (iii) words imparting the singular number only shall include the plural and vice versa; (iv) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (v) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vi) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; (vii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified; and (viii) "Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

(b)    The Company and Consenting Stakeholders have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

## EXHIBIT A

### Company Parties

IQOR HOLDINGS INC.
IQOR US INC.
ALLIED INTERSTATE LLC
COLLECTECH SYSTEMS LLC
CYBER CITY TELESERVICES MARKETING, INC.
FIRST CONTACT LLC
IQOR GLOBAL SERVICES, LLC
IQOR HOLDINGS US LLC
IQOR I LLC
IQOR MPC, LLC
IQOR OF TEXAS, LP
IQOR SELLER SERVICES LLC
IQOR TECHNOLOGIES INC.
IQOR TEXAS HOLDINGS, LLC
INTERACTIVE RESPONSE TECHNOLOGIES, LLC
RECEIVABLE MANAGEMENT SERVICES - RECOVERY DIVISION, LLC
RECEIVABLE MANAGEMENT SERVICES INTERNATIONAL, LLC
TECHFIVE, LLC
TELMAR ALLIED, LLC
TELMAR HOLDINGS I, INC.
THC HOLDINGS, INC.
THE RECEIVABLE MANAGEMENT SERVICES LLC
RMS CANADA HOLDING CORP.

## <u>EXHIBIT B</u>

### Restructuring Term Sheet

*EXECUTION VERSION*

---

## IQOR HOLDINGS INC., ET AL.
## <u>RESTRUCTURING TERM SHEET</u>

### July 23, 2020

---

This term sheet (the "<u>Term Sheet</u>") summarizes the material terms and conditions of restructuring and recapitalization transactions (the "<u>Restructuring Transactions</u>") regarding certain indebtedness of the Company Parties.  The Restructuring Transactions will be consummated through the prepackaged Plan filed in the Chapter 11 Cases on the terms, and subject to the conditions, set forth in the Restructuring Support Agreement (together with the exhibits and schedules attached to such agreement, including this Term Sheet, each as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "<u>RSA</u>").  The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Restructuring Transactions have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring Transaction.

This Term Sheet does not constitute (nor shall it be construed as) an offer with respect to any securities or a solicitation of acceptances or rejections as to any chapter 11 plan, it being understood that such a solicitation, if any, only will be made in compliance with applicable provisions of securities, bankruptcy, and/or other applicable laws.  This Term Sheet does not address all terms that would be required in connection with any potential restructuring and entry into or the creation of any binding agreement is subject to the negotiation, execution, and delivery of definitive documentation in accordance with the RSA.

Capitalized terms used but not initially defined in this Term Sheet shall have the meaning hereinafter ascribed to such terms, or if not defined in this Term Sheet, such terms shall have the meaning ascribed to such terms in the RSA.

This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions.  Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

| <u>Restructuring Overview</u> | |
|---|---|
| **Overview** | The Company Parties will implement the Restructuring Transactions in accordance with the RSA which shall be entered into by the Company Parties and the Consenting Stakeholders.  This Term Sheet is attached to and made a part of the RSA. |

KE 68082210

| Implementation | The Restructuring will be implemented through prepackaged Chapter 11 Cases by the Company Parties on the terms set forth in this Term Sheet and the RSA.  On the Plan Effective Date:<br><br>• all Priority Term Loan Claims shall be satisfied with the proceeds of the Term Loan DIP Facility;<br><br>• all A/R Facility Claims shall be satisfied with the proceeds of the ABL DIP Facility;<br><br>• all of the First Lien Term Loan Claims and Second Lien Term Loan Claims will be released and extinguished in exchange for the recoveries set forth below, including new common stock of the Reorganized Debtors (the "**New Common Stock**") (subject to dilution by the Management Incentive Plan) and, solely with respect to the First Lien Term Loan Claims, new term loans issued pursuant to the New Term Loan Agreement;<br><br>• all General Unsecured Claims[1], other than Sponsor Management Fee Claims, will be paid in full or otherwise provided such treatment as to render them unimpaired;<br><br>• all Sponsor Management Fee Claims[2] will be cancelled, released, and extinguished without any distribution on account of such Claims;<br><br>• all Series SS preferred Interests and Series A preferred Interests (collectively, the "**Existing Preferred Interests**") will be cancelled, released, and extinguished without any distribution on account of such Interests;<br><br>• all existing common Interests (the "**Existing Common Interests**") will be cancelled, released, and extinguished without any distribution on account of such Interests;<br><br>• all other Interests will be cancelled, released, and extinguished without any distribution on account of such Interests; and<br><br>• the Reorganized Debtors will enter into the Exit Facilities and the New Term Loan Facility. |
| :--- | :--- |
| **DIP Facilities** | Participation in the Term Loan DIP Facility, on terms and conditions consistent with this Term Sheet and as set forth in the term sheet attached |

---

[1] "**General Unsecured Claim**" means any Claim that is not (a) an administrative Claim, (b) a professional fee Claim, (c) a secured tax Claim, (d) an other secured Claim, (e) a priority tax Claim, (f) an other priority Claim, (g) a DIP Facilities Claim, (h) a First Lien Term Loan Claim, (i) a Second Lien Term Loan Claim, or (j) an Intercompany Claim, *provided* that, for the avoidance of doubt, the Sponsor Management Fee Claims shall be General Unsecured Claims.

[2] "**Sponsor Management Fee Claims**" means the $2.6 million in management fees owed by the Debtors to Sponsor HGGC, LLC.

hereto as **Annex A** (the "**Term Loan DIP Facility Term Sheet**"), shall be offered on a ratable basis to each First Lien Term Lender based on such First Lien Term Lender's amount of First Lien Term Loans relative to the aggregate outstanding principal amount of First Lien Term Loans pursuant to procedures, terms, conditions and documentation (in each case, to the extent applicable, consistent with the terms and conditions set forth herein and in the DIP Facility Term Sheet) reasonably acceptable to the Company Parties and the Required Consenting First Lien Term Lenders.

In accordance with the terms and conditions of the Term Loan DIP Facility Term Sheet, the Term Loan DIP Facility shall be backstopped by certain members of the ad hoc group of Consenting First Lien Term Lenders and Consenting Second Lien Term Lenders, represented by Gibson, Dunn & Crutcher LLP and Greenhill, LLC (the "**Ad Hoc Group**," and, solely in their capacity as First Lien Term Lenders, collectively, the "**DIP Backstop Parties**"). The DIP Backstop Parties shall earn the Backstop Commitment Premium (as defined in the Term Loan DIP Facility Term Sheet) for backstopping the Term Loan DIP Facility.

The proceeds of the Term Loan DIP Facility will be used to, among other things, (i) repay the obligations under the Priority Term Loan Facility, (ii) for working capital and general corporate purposes, (iii) to fund the administration of the chapter 11 cases, each solely in accordance with a budget reasonably acceptable to the lenders under the Term Loan DIP Facility, and (iv) to fund the carve-out.

Wells Fargo Bank, National Association (the "**ABL DIP Agent**" and, such other lenders as may be reasonably acceptable to the ABL DIP Agent and the Company Parties, the "**ABL DIP Lenders**") will provide commitments in an aggregate amount not to exceed $80 million for a superpriority asset-based, debtor-in-possession revolving credit facility (the "**ABL DIP Facility**" and, together with the Term Loan DIP Facility, the "**DIP Facilities**"), on terms and conditions as set forth in a term sheet by and between the ABL DIP Agent and the Company Parties, which shall be in form and substance acceptable to the Required Term DIP Lenders, the Required Consenting Priority Lenders, and the Required Consenting First Lien Term Lenders.

The proceeds of the ABL DIP Facility will be used to, among other things, (i) repay the obligations under that certain Credit Agreement, dated as of March 9, 2020 (as amended, modified, or otherwise supplemented from time to time, the "**A/R Facility Agreement**"), by and among iQor Receivables SPE LLC, as borrower, and Wells Fargo Bank, National Association, as lender (the "**A/R Facility Lender**"), (ii) for working capital and general corporate purposes, (iii) to fund the administration of the chapter 11 cases, each solely in accordance with a budget reasonably acceptable to the lenders under the ABL DIP Facility, and (iv) to fund the carve-out.

All outstanding claims on account of the DIP Facilities will be paid in full in cash on the Plan Effective Date (or such other consideration as the Term DIP

| | |
|---|---|
| | Lenders or ABL DIP Lenders agree in their sole discretion). |
| **Term Loan Exit Facility** | On the Plan Effective Date, the Reorganized Debtors will enter into the Term Loan Exit Facility on terms and conditions consistent with this Term Sheet and as set forth in the term sheet attached hereto as **Annex B** (the "**Term Loan Exit Facility Term Sheet**"). |
| | On the Plan Effective Date, a portion of the proceeds of the Term Loan Exit Facility shall be used to pay the Term Loan DIP Facility in full. |
| **ABL Exit Facility** | On the Plan Effective Date, the Reorganized Debtors will enter into a new asset based revolving credit facility in an aggregate commitment amount not to exceed $80 million (the "**ABL Exit Facility**") on terms and conditions consistent with this Term Sheet and as set forth in the term sheet governing the ABL Exit Facility, which term sheet shall be in form and substance acceptable to the Company Parties, the ABL Exit Facility lenders, and the Required Consenting First Lien Term Lenders. |
| | On the Plan Effective Date, a portion of the proceeds of the ABL Exit Facility shall be used to pay the ABL DIP Facility in full. |
| **New Term Loan Facility** | On the Plan Effective Date, reorganized iQor US Inc. ("**Reorganized iQor**") will issue the new term loans pursuant to the New Term Loan Agreement. Unless otherwise agreed to by the Company Parties and the Required Consenting First Lien Term Lenders, the terms of the New Term Loan Agreement shall include, among others:

- Borrower:  Reorganized iQor.

- Lenders: First Lien Term Lenders.

- Principal amount:  $300 million.

- Economics:

   o *Interest Rate*: LIBOR + 7.50%, paid quarterly in cash (with a 1.00% LIBOR floor), subject to adjustment during first two years of the New Term Loan Facility based on the  exercise of the PIK Toggle (as defined below).

   o *PIK Toggle*:  Within the first two years following the Plan Effective Date, Reorganized iQor may, at its option, toggle interest to payment-in-kind ("**PIK**," and, the interest payment option, the "**PIK Toggle**"); *provided* that the PIK Toggle will only be available if the trailing twelve-month EBITDA of the call center business of the Reorganized Debtors as of the most recently ended four-quarter period for which financials have been delivered is less than $85 million.

      ▪ In the event Reorganized iQor opts to exercise the PIK Toggle, the interest rate under the New Term Loan Facility will increase to LIBOR + 10.00%, comprised |

of (i) L + 5.00% (1.00% LIBOR Floor) paid quarterly in cash and (ii) 5.00% paid quarterly in-kind.

- <u>Maturity</u>:  Five (5) years following the Plan Effective Date.

- <u>Amortization</u>:  1.00% per annum payable quarterly.

- <u>Excess Cash Flow Sweep</u>:  Commencing with the first full fiscal year ending after the Plan Effective Date, the New Term Loan Facility will provide for a sweep of excess cash flow based on a consolidated net leverage framework consistent with the following:

  o 50% of excess cash flow to be swept annually until consolidated net leverage is below 3.0x; *provided* that no such excess cash flow prepayment shall be required until after the Term Loan Exit Facility has been paid in full.

  o Excess cash flow sweep shall (i) permit repayment of balance of all funded indebtedness, thereby reducing such required prepayments, (ii) contain carveouts to be determined for ordinary course reinvestment in business operations, which, for the avoidance of doubt, shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Term Loan Lenders, and (iii) not be subject to any call premium.

- <u>Call Protection</u>:  Voluntary prepayments and mandatory prepayments from the proceeds of non-permitted indebtedness will be required to be made in an amount equal to 103% of the principal repaid for the first year following the Plan Effective Date, 102% of the principal repaid for the second year, and 101% of the principal repaid for the third year, and 100% thereafter.

- <u>Priority</u>:  Subject to the applicable ABL / Term Loan intercreditor agreement, junior in right of payment to:  (a) the Term Loan Exit Facility in accordance with an intercreditor agreement to be entered into on the Plan Effective Date; and (b) the ABL Exit Facility solely with respect to the ABL Facility collateral.

- <u>Collateral</u>:  Collateral package will include, subject to applicable ABL / Term Loan intercreditor agreement, a first priority lien on existing collateral under the First Lien Term Loan Facility and pledge of all material unencumbered collateral, including, but not limited to, 100% of the equity interests of any first tier foreign subsidiaries; <u>provided</u> that, the receivables securing any vendor financing programs permitted under the New Term Loan Facility shall be excluded from the definition of Collateral.

- <u>Additional Terms</u>:

  o No financial covenants.

- o The Reorganized Debtors will use commercially reasonable efforts to obtain ratings, but no specific rating, from two nationally recognized ratings agencies within 30 days of closing of the New Term Loan Facility.

- o The New Term Loan Agreement will include standard and customary events of default for a facility of this kind and in form and substance acceptable to the Company Parties and the Required Consenting First Lien Term Lenders.

- o All other terms including, without limitation, covenants (including, without limitation, reporting, debt and lien incurrence, restricted payment and permitted payment baskets) shall be consistent with facilities of this kind and in form and substance acceptable to the Company Parties and the Required Consenting First Lien Term Lenders.

- o Any terms may be modified subject to the consent of the Company Parties and the Required Consenting First Lien Term Lenders.

## TREATMENT OF CLAIMS AND INTERESTS

| Type of Claim | Treatment | Impairment/ Voting |
|---|---|---|
| **Administrative and Priority Tax Claims** | Each holder of an Allowed[3] administrative claim or priority tax claim shall receive cash equal to the full amount of its claim or such other treatment as required by section 1129(a)(9) of the Bankruptcy Code, unless otherwise agreed to by such holder or permitted by the Bankruptcy Code. | N/A |
| **Other Secured Claims** | Each holder of an Allowed other secured claim, including, but not limited to, secured claims of all equipment lessors, shall receive, in full and final satisfaction of such claims, either (a) payment in full in cash, (b) delivery of the collateral securing such claim, (c) reinstatement of such claim, or (d) such other treatment rendering such claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired; Presumed to Accept. |

---

[3] "**Allowed**" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law

| Other Priority Claims | Each holder of an Allowed other priority claim shall receive cash in an amount equal to such claim. | Unimpaired; Presumed to Accept. |
|---|---|---|
| Priority Term Loan Claims | If Priority Term Loan Claims are not satisfied with proceeds of the Term Loan DIP Facility, each holder of an Allowed Priority Term Loan claim shall receive cash in an amount equal to such claim. | Unimpaired; Presumed to Accept. |
| A/R Facility Claims | If A/R Facility Claims are not satisfied with proceeds of the ABL DIP Facility, each holder of an Allowed A/R Facility claim shall receive cash in an amount equal to such claim. | Unimpaired; Presumed to Accept. |
| First Lien Term Loan Claims | Each holder of an Allowed First Lien Term Loan Claim will receive, in full and final satisfaction of such allowed First Lien Term Loan Claim, its pro rata share of: (i) new term loans under the New Term Loan Facility; and (ii) 95.75% of the New Common Stock (subject to dilution on account of the Management Incentive Plan). | Impaired; Entitled to Vote. |
| Second Lien Term Loan Claims | Each holder of an Allowed Second Lien Term Loan Claim will receive, in full and final satisfaction of such allowed Second Lien Term Loan Claim, its pro rata share of 4.25% of the New Common Stock (subject to dilution on account of the Management Incentive Plan). | Impaired; Entitled to Vote. |
| General Unsecured Claims | Each holder of an Allowed General Unsecured Claim shall receive either: (i) reinstatement of such allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in cash on (a) the Plan Effective Date, or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such allowed General Unsecured Claim; *provided, however* that, each holder of Sponsor Management Fee Claims shall be conclusively deemed to have waived any recovery on account of its Sponsor Management Fee Claims and the Sponsor Management Fee Claims shall be cancelled and released without any distribution on account of such Claims. | Unimpaired; Presumed to Accept. |
| Intercompany Claims | Intercompany Claims[4] shall be, at the option of the Reorganized Debtors, either: (i) reinstated; or (ii) cancelled | Unimpaired; Presumed to Accept / Impaired; |

---

[4]    "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor.

| | and released without any distribution on account of such Claims. | Presumed to Reject. |
|---|---|---|
| **Intercompany Interests** | Intercompany Interests[5] shall be, at the option of the Reorganized Debtors, either: (i) reinstated; or (ii) cancelled and released without any distribution on account of such Interests. | Unimpaired; Presumed to Accept / Impaired; Presumed to Reject. |
| **Existing Preferred Interests** | Existing Preferred Interests shall be cancelled, released, and extinguished without any distribution on account of such Interests. | Impaired; Presumed to Reject. |
| **Existing Common Interests** | Existing Common Interests shall be cancelled, released, and extinguished without any distribution on account of such Interests. | Impaired; Presumed to Reject. |
| **Other Interests** | Other Interests will be cancelled, released, and extinguished and will be of no further force and effect. | Impaired; Presumed to Reject. |
| **GENERAL PROVISIONS** | | |
| **Charter, By-Laws and Organizational Documents** | All governance documents to be in form and substance acceptable to the Required Consenting First Lien Term Lenders and the Company Parties. In accordance with the Plan, the forms of certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), or other similar organizational documents, as applicable, of the Reorganized Debtors will become effective as of the Plan Effective Date. | |
| **Management Incentive Plan** | The Plan will provide for the establishment of a post-emergence management incentive plan to be adopted by the New Board (the "**Management Incentive Plan**"), which will (i) include restricted stock units, options, New Common Stock, or other rights exercisable, exchangeable, or convertible into New Common Stock representing up to 10% of the New Common Stock on a fully diluted and fully distributed basis and (ii) include other terms and conditions customary for similar type equity plans. | |
| **Vesting of Assets** | On the Plan Effective Date, pursuant to section 1141(b)-(c) of the Bankruptcy Code, all property in each estate, all causes of action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the | |

---

[5]      "**Intercompany Interest**" means an Interest in a Debtor held by another Debtor.

8

| | |
|---|---|
| | Reorganized Debtors free and clear of all liens, Claims, and encumbrances, except as otherwise provided by the Plan. |
| **Survival of Indemnification Provisions and D&O Insurance** | All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Plan Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties than the indemnification provisions in place prior to the Plan Effective Date. |
| | In addition, after the Plan Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date. |
| **Claims of the Debtors** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action released by the Debtors pursuant to the release and exculpation provisions outlined in this Term Sheet. |
| **Releases** | The Plan and the Confirmation Order will contain the exculpation provisions, the Debtor releases, and the "third-party" releases set forth in **Annex 1** to this Term Sheet. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre Plan Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other customary purposes. |
| **Tax Structure** | To the extent practicable, the Restructuring Transactions contemplated by this Term Sheet will be structured so as to obtain the most beneficial tax structure for the Company Parties, as determined by the Company Parties and the Required Consenting First Lien Term Lenders. |

| | |
|---|---|
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from registration under the Securities Act and applicable law. |
| **Additional Plan Provisions and Documentation** | The Plan shall contain other customary provisions for chapter 11 plans of this type, which provisions shall be consistent with this Term Sheet and the RSA, including the consent rights set forth therein. |
| **Conditions Precedent to Plan Effective Date** | It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived: |
| | (a) the Bankruptcy Court shall have entered the DIP Orders and the final DIP Order shall have become a Final Order; |
| | (b) the DIP Facilities shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be compliance therewith; |
| | (c) the Bankruptcy Court shall have entered the Confirmation Order and such order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered; |
| | (d) no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise preventing, prohibiting, or restricting in any material respect, the Restructuring Transactions contemplated by the RSA; |
| | (e) the Debtors shall have obtained all governmental and regulatory approvals, consents, authorizations, rulings, or other documents that are legally required for the consummation of the Restructuring Transactions, not subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods under the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended, shall have expired; |
| | (f) each document or agreement constituting the Definitive Documents shall have been executed and/or effectuated and shall be in form and substance consistent with the RSA, including, without limitation, any consent rights included therein; |
| | (g) to the extent invoiced, the payment of all reasonable and documented fees and expenses of the Ad Hoc Group related to the implementation of the Restructuring Transactions and not previously paid by the Company Parties, including the fees and expenses of Gibson, Dunn & Crutcher LLP and Greenhill & Co., LLC; |
| | (h) the final version of the Plan and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the RSA; |

| | |
|---|---|
| (i) | all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date have been placed in the professional fee escrow account; |
| (j) | the RSA shall not have been terminated, shall remain in full force and effect; |
| (k) | entry into the Exit Facilities Documents[6] required to be executed as of the Plan Effective Date, and all conditions precedent to the consummation of such Exit Facilities Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such Exit Facilities Documents shall have occurred; |
| (l) | entry into the New Term Loan Documents required to be executed as of the Plan Effective Date, and all conditions precedent to the consummation of such New Term Loan Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New Term Loan Documents shall have occurred; |
| (m) | the New Common Stock shall have been issued by the Reorganized Debtors; |
| (n) | the Debtors shall have otherwise substantially consummated the Restructuring Transactions, and all transactions contemplated in the Plan, in a manner consistent in all respects with the RSA and the Plan; and |
| (o) | such other conditions precedent to the Plan Effective Date, as are necessary to consummate the Restructuring Transactions and otherwise reasonably acceptable to the Company Parties, the Required DIP Lenders, the Required Consenting First Lien Term Lenders, and the Sponsors. |

---

[6]   "**Exit Facilities Documents**" means the agreements memorializing the ABL Exit Facility and the Term Loan Exit Facility, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the ABL Exit Facility or the Term Loan Exit Facility.

## ANNEX 1

**Exculpation and Release Language**

1.      "***Exculpated Parties***" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) each Company Party; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Group, solely to the extent such member is a Consenting Stakeholder; (e) any statutory committee appointed in the Chapter 11 Cases and each of their respective members; and (f) each current and former affiliate of each Entity in clause (a) through the following clause (e); and (e) each Related Party of each Entity in clause (a) through this clause (f).

2.      "***Related Party***" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, assignors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

3.      "***Released Parties***" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) the Ad Hoc Group; (e) each Company Party; (f) each Agent; (g) the A/R Facility Lender; (h) each Priority Term Loan lender; (i) each First Lien Term lender; (j) each Second Lien Term lender; (k) each DIP lender; (l) each Exit Facility lender; (m) all holders of Interests; (n) each Sponsor; (o) each New Term Loan Facility lender; and (p) each current and former affiliate of each Entity in clause (a) through the following clause (q); and (q) each Related Party of each Entity in clause (a) through this clause (q); provided that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before confirmation of the Plan.

4.      "***Releasing Parties***" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) the Ad Hoc Group; (e) each Company Party; (f) each Agent; (g) the A/R Facility Lender; (h) each Priority Term Loan lender; (i) each First Lien Term lender; (j) each Second Lien Term lender; (k) each DIP lender; (l) each Exit Facility lender; (m) all holders of Claims; (n) all holders of Interests; (o) each Sponsor; (p) each New Term Loan Facility lender; and (q) each current and former affiliate of each Entity in clause (a) through the following clause (r); and (r) each Related Party of each Entity in clause (a) through this clause (r); provided that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before confirmation of the Plan.

A. *Releases by the Debtor.*

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action,[7] directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any avoidance actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the DIP Credit Agreements, the Disclosure Statement, the New Term Loan, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Credit Agreements, the Disclosure Statement, the New Term Loan, the Exit Facilities, the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date.  Notwithstanding anything**

---

[7]   "*Causes of Action*" means any claims, interests, damages, judgments, remedies, causes of action, controversies, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, indemnities, and guaranties of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law preferential or fraudulent transfer or similar claim.

to the contrary in the foregoing, the releases set forth above do not release (a) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Term Loan Documents, the Exit Facilities Documents, or any Claim or obligation arising under the Plan or (b) any individual from any Claim or Cause of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

B.  *Releases by the Holders of Claims and Interests.*

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any avoidance actions (but excluding avoidance actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of RSA, the DIP Credit Agreements, the Disclosure Statement, the New Term Loan, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the DIP Credit Agreements, the New Term Loan, the Exit Facilities, the Disclosure Statement, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the

issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Term Loan Documents, the Exit Facilities Documents, or any Claim or obligation arising under the Plan or (b) any individual from any Claim or Cause of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

*Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the DIP Documents, the New Term Loan Facility, the Exit Facilities, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for claims related to any act or omission that constitutes actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## Annex A

**Term Loan DIP Facility Term Sheet**

EXECUTION VERSION

## Term Loan DIP Facility Term Sheet[1]

| | |
|---|---|
| **Implementation** | This Term Loan DIP Facility Term Sheet sets forth the principal terms of the Term Loan DIP Facility Credit Agreement and the other definitive documents governing the Term Loan DIP Facility (collectively, the "Term Loan DIP Documents") which shall be in form and substance acceptable to the Company Parties and the Term DIP Lenders to be entered into with the Borrower and certain of its direct and indirect domestic subsidiaries in connection with their respective Chapter 11 Cases. <br><br> The Term Loan DIP Facility, and the authority of the Debtors to enter into the Term Loan DIP Credit Agreement, will be subject to the approval of the Bankruptcy Court, pursuant to and in accordance with (i) the DIP Orders and (ii) the Term Loan DIP Documents. |
| **Borrower** | iQor US Inc., a Delaware corporation, as debtor-in-possession ("Borrower") in the chapter 11 bankruptcy case or cases to be pending in the Bankruptcy Court with respect to Borrower and certain of its subsidiaries upon the Petition Date. |
| **Guarantors** | All obligations under the Term Loan DIP Facility and the Term Loan DIP Loan Documents will be unconditionally guaranteed jointly and severally on a super-priority secured basis by each Debtor (collectively, the "Guarantors"). |
| **Term DIP Lenders** | Certain First Lien Term Lenders (the "Term DIP Lenders"). |
| **Agent** | Wilmington Savings Fund Society, FSB (in such capacity, the "Term DIP Agent"). |
| **DIP Term Facility** | Subject to an applicable intercreditor agreement (which shall be in form and substance acceptable to the Required Term DIP Lenders, the "DIP Intercreditor Agreement"), a super-priority and priming (in each case, to the extent set forth herein) debtor-in-possession term loan credit facility in the amount of $50 million (the "Term DIP Commitments") to be funded into an escrow account upon entry of the interim order approving the Term Loan DIP Facility (the "Interim DIP Order"), subject to customary escrow withdrawal mechanics, which shall be consistent with the withdraw mechanics under the Priority Term Loan Credit Agreement.  Loans under the Term Loan DIP Facility (the "Term DIP Loans") shall be offered *pro rata* to all First Lien Term Loan Lenders. |
| **Backstop Parties** | The Term Loan DIP Facility shall be backstopped by the DIP Backstop Parties. |
| **Use of Proceeds** | Subject to usual and customary provisions to be set forth in the DIP Orders, Borrower will use the proceeds of the Term Loan DIP Facility:  (i) to repay the obligations under the Priority Term Loan Facility, (ii) for working capital and general corporate purposes, (iii) to fund the administration of the chapter 11 cases, each solely in accordance with the Approved Budget (subject to the Budget |

---

[1]   Capitalized terms used but not defined in this DIP Facility Term Sheet shall have the meanings ascribed to such terms in the RSA or the Restructuring Term Sheet, to which this Term Loan DIP Facility Term Sheet is attached.

| | |
|---|---|
| | Variance) (each as defined herein), which Approved Budget shall be prepared by Borrower and shall be in form and substance acceptable to the Required Term DIP Lenders, and (iv) to fund the Carve-Out (as defined herein). |
| **Interest Rate** | L + 10.00% (1.00% LIBOR floor). |
| **Fees** | <ul><li>A backstop commitment payable to the DIP Backstop Parties equal to 5.00% of the aggregate principal amount of the Term DIP Loans funded by each DIP Backstop Party (the "<u>DIP Backstop Commitment</u>").</li><li>A commitment fee equal to 2.00% of the aggregate principal amount of each Term DIP Lender's DIP Commitment (the "<u>DIP Commitment Fee</u>").</li><li>A fronting / seasoning fee to be determined and incremental to the DIP Commitment Fee and DIP Backstop Commitment and to be paid out of the proceeds of the Term DIP Loans.</li></ul> |
| **Term** | The Term Loan DIP Facility and Term Loan DIP Agent and the Term DIP Lenders' commitments and obligations shall terminate, and all obligations under the Term Loan DIP Facility will be immediately due and payable in full in cash on the earliest to occur (the "<u>Termination Date</u>") of:<br><br>(a) in the event that solicitation of a prepackaged chapter 11 plan of reorganization is commenced prior to the Petition Date, three (3) months after the Petition Date, subject to one (1) month extensions at the sole discretion of the Term DIP Lenders holding at least 50.01% of the aggregate outstanding principal amount of Term DIP Loans that are held by Term DIP Lenders (the "<u>Required Term DIP Lenders</u>");<br>(b) in the event that solicitation of a prepackaged chapter 11 plan of reorganization is not commenced prior to the Petition Date, five (5) months after the Petition Date; or<br>(c) the effective date of a chapter 11 plan of reorganization. |
| **Collateral** | Subject to the DIP Intercreditor Agreement and the Carve-Out, the collateral securing the Term Loan DIP Facility (the "<u>Term Loan DIP Collateral</u>") and, the liens and security interests thereon and therein, the "<u>Term Loan DIP Liens</u>") shall consist of:<br><br>(a) priming, perfected first priority liens on all collateral granted under the Priority Term Loan Facility;<br>(b) perfected first priority liens on all property of the Debtors that is not subject to valid, perfected and non-avoidable liens as of the Petition Date (including such liens arising under permitted vendor financing programs) and the proceeds thereof;<br>(c) perfected first priority liens on ABL DIP collateral, subject only to the security interests and liens, and the priorities thereof, of the ABL DIP Facility; and<br>(d) perfected junior lien on all property of the Debtors that is subject to valid, perfected and non-avoidable liens in existence as of the Petition Date, other than liens securing the |

| | First Lien Term Loan Facility and the Priority Term Loan Facility). |
|---|---|
| | As set forth in the Interim DIP Order and the final order approving the Term Loan DIP Facility (the "Final DIP Order"), all obligations of the Borrower and the Guarantors to the Term Loan DIP Lenders and to the Term DIP Facility Agent shall be subject to the Carve-Out. All Term Loan DIP Liens authorized and granted pursuant to the DIP Orders shall be deemed valid, binding, enforceable, effective and automatically perfected and non-avoidable as of the Petition Date, and no further filing, notice, or act under applicable law or otherwise will be required to effect such perfection. The Term DIP Lenders, or the Term DIP Facility Agent on behalf of the Term DIP Lenders, shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be necessary under state law or other applicable law in order to enforce the security, perfection or priority of the Term DIP Lenders' claims described herein. |
| **Carve-Out** | • The "Carve-Out" shall be usual and customary for similar debtor-in-possession financings and shall be in an amount equal to: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee, (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000, (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and the official committee of unsecured creditors (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time on or prior to the delivery of a Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Trigger Notice, and (iv) Allowed Professional Fees of Professional Persons incurred after the delivery of a Trigger Notice, in an amount not to exceed $1,000,000, to the extent allowed at any time (the "Post-Carve-Out Trigger Notice Cap"), in each case subject to the limits imposed by the DIP Orders. <br><br> • "Trigger Notice" shall mean a written notice delivered by the Term DIP Agent describing the event of default that is alleged to continue under the Term Loan DIP Documents, stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **Adequate Protection** | Pursuant to Sections 361, 363(c), 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of (x) the incurrence of the DIP Facilities, (y) the imposition of the automatic stay, and (z) the Debtors' use of cash collateral of the First Lien Term Loan Lenders, the Debtors and the Term DIP Lenders agree, subject to Bankruptcy |

<table>
<tr><td></td><td>Court approval, to the following forms of adequate protection (the "<u>Adequate Protection</u>"):

(a) valid, binding, enforceable and perfected replacement liens on and security interests in the Term Loan DIP Collateral, which liens and security interests shall be junior and subordinate only to the Carve-Out, the DIP Liens, and other permitted liens (such liens, the "<u>Adequate Protection Liens</u>") and a super-priority administrative claim in the Chapter 11 Cases;

(b) subject to the Carve-Out, superpriority administrative expense claims as provided by section 507(b) of the Bankruptcy Code, junior to the claims of the Term DIP Agent and the Term DIP Lenders;

(c) without duplication of amounts required to be paid pursuant to the Term Loan DIP Facility, payment in cash of all reasonable and documented out-of-pocket fees and expenses of the Ad Hoc Group (including all reasonable fees and expenses of Gibson, Dunn & Crutcher LLP and Greenhill & Co., LLC) that have accrued as of the Petition Date; and thereafter, within five (5) business days of presentment of invoices (subject to review by the Debtors, the U.S. Trustee, and any committee appointed in the Chapter 11 Cases during the review period), in each case in their respective capacities as such (the "<u>Adequate Protection Payments</u>");

(d) immediate pay down upon receipt of proceeds of the sale of Term Loan DIP Collateral (to the extent permitted by the Term Loan DIP Documents and the DIP Orders, subject to prior repayment in full and cancellation of the Term Loan DIP Facility); and

(e) financial and other periodic reporting substantially in compliance with the Priority Term Loan Facility and as required under the Term Loan DIP Credit Agreement.</td></tr>
<tr><td><strong>Affirmative Covenants</strong></td><td>• Usual and customary for facilities of this type and in form and substance acceptable to the Company Parties and the Required Term DIP Lenders, including, but not limited to:
(a) Weekly cumulative variance testing on a rolling four (4) week basis;
(b) Receipts test with a 20% cushion and one (1) week cure period;
(c) Disbursements test with a 10% cushion and additional cushion of up to 2.5% (total of 12.5%) if Borrower demonstrates that variance in excess of 10% is a result of new business opportunities or client ramping.

• Prior to the earlier to occur of (i) fifteen (15) days after the Petition Date and (ii) the entry of the Final DIP Order, the Borrower shall use commercially reasonable efforts to obtain private credit ratings (but no specific rating) of the DIP Facility by both Moody's and S&P.</td></tr>
</table>

4

| | |
|---|---|
| | • Other covenants to be usual and customary for transactions of this type and in form and substance acceptable to the Company Parties and the Required Term DIP Lenders. |
| **Negative Covenants** | Usual and customary for facilities of this type, which shall permit vendor financing programs, and in any event be in form and substance acceptable to the Company Parties and the Required Term DIP Lenders. |
| **Events of Default** | Events of default (the "Events of Default") shall consist of those which are customary for transactions of this nature and in form and substance acceptable to the Company Parties and the Required Term DIP Lenders. |
| **Conditions Precedent** | Usual and customary for DIP Facilities of this type and in form and substance acceptable to the Company Parties and the Required Term DIP Lenders, including but not limited to:<br><br>(a) receipt of acceptable DIP budget and latest 13-week Cash Flow Forecast;<br>(b) payment of accrued reasonable and documented advisor fees of the Ad Hoc Group; and<br>(c) entry of Interim DIP Order followed by entry of the Final DIP Order. |
| **Milestones** | • On the Petition Date, the Debtors shall file the Disclosure Statement and Plan.<br><br>• No later than two (2) business days after the Petition Date, the Bankruptcy Court shall have entered in the Interim DIP Order.<br><br>• No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.<br><br>• No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Disclosure Statement.<br><br>• No later than forty-five (45) days after the Petition Date, the Plan Effective Date shall have occurred; provided that, if regulatory approvals associated with a Restructuring Transaction remain pending as of such date, this date shall automatically be extended to the date that is the third Business Day following receipt of all regulatory approvals. |
| **Reporting** | Usual and customary for financings of this type and in form and substance acceptable to the Company Parties and the Required Term DIP Lenders, including, but not limited to:<br>(a) Weekly cash flow reporting (including the continuation of weekly calls), including variance reporting in the same format as the agreed to budget.<br>(b) Monthly financial reporting (including KPIs). |

5

| | |
|---|---|
| | For the avoidance of doubt, the Term DIP Lenders shall also receive all reporting provided to the lenders under the ABL DIP. |
| **Other Terms and Conditions** | Additional terms and conditions in form and substance acceptable to the Company Parties and the Required Term DIP Lenders, including, but not limited to, the following:<br><br>(a) Other than the vendor financing currently subject to potential termination, the vendor financing shall remain in place.<br><br>(b) The Debtors shall waive their right to surcharge pursuant to section 506(c) of the Bankruptcy Code the Term Loan DIP Collateral and, upon entry of the Final DIP Order, the collateral of the Priority Term Loan Lenders.<br><br>(c) In no event, subject to entry of the Final DIP Order, shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Priority Term Loan Lenders and the First Lien Term Loan Lenders.<br><br>(d) In no event shall any of the Term DIP Agent, the Term DIP Lenders and, subject to entry of the Final DIP Order, the Priority Term Loan Lenders, be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Term Loan DIP Collateral. |

## Annex B

**Term Loan Exit Facility Term Sheet**

*Execution Version*

## Term Loan Exit Facility Term Sheet[1]

| | |
|---|---|
| **Borrower** | iQor US Inc. |
| **Guarantors** | All wholly-owned direct and indirect subsidiaries of the Borrower. |
| **Size** | $75 million to $97.5 million |
| **Collateral** | Subject to the applicable ABL / Term Loan intercreditor agreement:<br>• First priority liens on all collateral granted under the Priority Term Loan Facility;<br>• First priority liens on all property of the Company Parties not subject to valid, perfected and non-avoidable liens as of the Plan Effective Date (including any permitted vendor financing programs) and the proceeds thereof;<br>• First priority liens on ABL Exit Facility collateral, subject only to the security interests and liens, and the priorities thereof, of the ABL Exit Facility; and<br>• Payment priority over New Term Loan Facility via intercreditor agreement. |
| **Maturity** | Four (4) years following the Plan Effective Date |
| **Rate** | L + 7.50%, quarterly cash-pay (subject to 1.00% bps LIBOR floor) |
| **Fees** | • Backstop premiums payable to the DIP Backstop Parties equal to (i) 5.00% of the aggregate principal amount of loans under the Term Loan Exit Facility in excess of the Term DIP Loans (as defined in the Term Loan DIP Facility Term Sheet) and (ii) 3.00% of the aggregate principal amount of Term DIP Loans used to repay the Priority Term Loan Facility (collectively, the "Exit Facility Backstop Premiums").<br>• 2.00% commitment premium payable to all participating lenders (the "Exit Facility Commitment Premium").<br>• Fronting / seasoning fee to be determined and incremental to the Exit Facility Commitment Premium and the Exit Facility Backstop Premiums. |
| **Amortization** | 1.0% per annum scheduled amortization, payable quarterly. |
| **Prepayments** | • Excess Cash Flow Sweep:  Commencing with the first full fiscal year ending after the Plan Effective Date, the Term Loan Exit Facility will provide for a sweep of excess cash flow based on a consolidated net leverage framework consistent with the following:<br>  • 50% of excess cash flow to be swept annually until consolidated net leverage is below 3.0x.<br>  • Excess cash flow sweep shall (i) permit repayment of balance of all funded indebtedness, thereby reducing such required prepayments, (ii) contain to be determined carveouts for facilities of this type for ordinary course |

---

[1]   Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the RSA, the Restructuring Term Sheet, or the DIP Term Sheet, as applicable.

| | |
|---|---|
| | reinvestment in business operations, which, for the avoidance of doubt, shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Term Lenders, and (iii) not be subject to any call premium. |
| | • <u>Call Protection</u>:  Voluntary prepayments and mandatory prepayments from the proceeds of non-permitted indebtedness will be required to be made in an amount equal to 103% of the principal repaid for the first year following the Plan Effective Date, 102% of the principal repaid for the second year, and 101% of the principal repaid for the third year, and 100% thereafter. |
| | • Usual and customary for facilities of this type in form and substance acceptable to the Company Parties and the Required Consenting First Lien Term Lenders. |
| **Use of Proceeds** | Use of proceeds limited to (i) working capital, (ii) general corporate purposes, (iii) paydown of the Term Loan DIP Facility, and (iv) costs related to emergence from chapter 11. |
| **Affirmative and Negative Covenants** | • To be determined ordinary course baskets for facilities of this type and in form and substance acceptable to the Company Parties and the Required Consenting First Lien Term Lenders to allow for reinvestment in business operations<br>• Otherwise subject to customary and usual exceptions, limitations, qualifications and "baskets" for facilities of this type, which shall permit vendor financing programs, and shall in any event be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Term Lenders.<br>• Commercially reasonable efforts to obtain ratings (but no specific rating) from two nationally recognized agencies within 30 days of the Plan Effective Date. |
| **Financial Covenants** | To be determined, but usual and customary for facilities of this type and in form and substance acceptable to the Company Parties and Required Consenting First Lien Term Lenders. |
| **Hedging Requirements** | None. |
| **Reporting** | • Quarterly management calls<br>• Quarterly reporting consistent with customary requirements for public filers<br>• For the avoidance of doubt, the Term Loan Exit Facility Lenders shall receive all reporting provided to the Exit ABL Lenders |
| **Events of Default** | Standard and customary events of default for facilities of this type and in form and substance acceptable to the Company Parties and the Required Consenting First Lien Term Lenders. |

## EXHIBIT C

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of July 23, 2020 (the "**Agreement**"), by and among the Company Parties and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a ["Consenting Priority Lender"] ["Consenting First Lien Term Lender"] ["Consenting Second Lien Term Lender"] under the terms of the Agreement.[1]

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:
Address:


E-mail address(es):


| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
| --- | --- |
| Priority Term Loans | |
| First Lien Term Loans | |
| Second Lien Term Loans | |

---

[1]     Capitalized terms used but not defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT D

### Form of Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of July 23, 2020 (the "**Agreement**"), by and among the Company Parties and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a ["Consenting Priority Lender"] ["Consenting First Lien Term Lender"] ["Consenting Second Lien Term Lender"] under the terms of the Agreement.[3]

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:


E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| Priority Term Loans | |
| First Lien Term Loans | |
| Second Lien Term Loans | |

---

[3]    Capitalized terms used but not defined herein shall having the meaning ascribed to such terms in the Agreement.

**Exhibit B**

**Corporate Structure Chart**

iQor
Legend
Priority Term Loan Borrower
Priority Term Loan Guarantor
IL Term Loan Borrower
1L Term Loan Guarantor
2L Term Loan Borrower
2L Term Loan Guarantor
Wells Fargo A/R Facility Borrower
Wells Fargo A/R Facility
Pledgor
Servicer
Holdings
Originator
Originating Sellers
HGGC Interests
SCPC Interests
iQor Sponsor Holdings, LLC
TRG Interests
Management / Other Interests
iQor Holdings Inc. (DE)
Employees
Profit interest
iQor I LLC (DE)
iQor US Inc. (DE)
iQor Global Services, LLC (FL)
Receivable Management Services International, LLC (DE)
First Contact LLC (MN)
Allied Interstate LLC (MN)
IRMC Mauritius Limited (Mauritius)
iQor Holdings US LLC (DE)
Collectech Systems LLC (CA)
iQor Technologies Inc. (DE)
CCT Group Limited (Cayman Islands)
iQor Canada Ltd. (Canada)
iQor Trinidad Limited (Trinidad and Tobago)
iQor MPC, LLC (FL)
iQor Texas Holdings, LLC (FL)
TechFive, LLC (DE)
THC Holdings, Inc. (DE)
iQor Philippines, Inc. (Philippines)
The Receivable Management Services LLC (DE)
iQor Receivables SPE 2, LLC (DE)
iQor India Services Private Ltd. (India)
RMS Collect Phils. Inc. (Philippines)
iQor Netherlands C.V. (Netherlands)
iQor Polska Sp. z o.o. (Poland)
Interactive Response Technologies, LLC (DE)
iQor Panama Inc. (Panama)
iQor of Texas, LP (FL)
Telmar Holdings I, Inc. (DE)
Receivable Management Services (HK) Limited (Hong Kong)
Receivable Management Services de Mexico, S. de R.L. de C.V. (Mexico)
RMS Canada Holding Corp. (DE)
Receivable Management Services – Recovery Division, LLC (DE)
iQor Receivables SPE LLC (DE)
iQor Seller Services, LLC (DE)
Cyber City Teleservices Marketing, Inc. (DE)
Cyber City Teleservices Ltd. (BVI)
Telmar Allied, LLC (DE)
Servicios de Corbranza Integral, S. de R.L. de C.V. (Mexico)
Cyber City Teleservices (Phils.) Inc. (Philippines)
iQor Global Services de Mexico S.A de C.V. (Mexico)

